Argued June 9, 1967, reversed April 10, petition for
rehearing denied May 14, 1968

WAMPLER, *Respondent, v.* PALMERTON ET AL,
*Appellants.*
439 P. 2d 601

*H. F. Smith,* Klamath Falls, argued the cause for appellants. With him on the briefs was Paul E. Geddes, Roseburg.

*James W. Walton,* Corvallis, argued the cause for respondent. With him on the brief were Ringo, Walton & McClain, Corvallis.

Before Perry, Chief Justice, and Sloan, O'Connell, Goodwin and Holman, Justices.

HOLMAN, J.

This is an action in tort for damages for humiliation, embarrassment, loss of reputation and credit rating, which is claimed to have resulted from interference by defendants with a contract between plaintiff and Diamond Lake Lumber Company (Diamond Lake). The defendants Newman and Palmerton appealed from a judgment of $72,500 in favor of plaintiff after a jury trial.

One of defendants' assignments of error is the court's denial of their motion for a directed verdict. They contend there is insufficient evidence to substantiate a cause of action against them. The facts stated in the manner most favorable to plaintiff are as follows.

Diamond Lake was a corporation engaged in the operation of sawmills. Defendant Newman was its President, its managing officer, a member of its board of directors and a stockholder. Defendant Palmerton, Newman's father-in-law, was employed by Diamond Lake as a business advisor. He was an unsecured creditor of the corporation in the amount of about $200,000 and a co-signer of its performance bond on a timber purchase contract subsequently described. He had the right under a contract with Diamond Lake and its stockholders to assume the management of the corporation for the benefit of its unsecured creditors. He did not exercise this right at any time material to this litigation.

Diamond Lake purchased a large block of government timber. It entered into a contract with plaintiff to log the timber for it in compliance with its contract with the government and to haul the logs to Diamond Lake's mills. The parties contemplated that the contract would take five years to complete. The government contract required, as part of the logging, that timber access roads be built to government specifications. The anticipated cost of the road construction was in the neighborhood of $300,000. Plaintiff assumed this obligation as part of the logging. The cost of road construction was one of the factors considered in fixing the price he was to receive for logs delivered at Diamond Lake's mills.

On April 20, 1959, when the written contract was made between plaintiff and Diamond Lake, Diamond Lake's assets were less than its liabilities, and plaintiff had a net worth of about $40,000. Defendants knew that plaintiff lacked the financial resources with which to make the large, preliminary expenditures necessary for roads. The defendant Newman, both before and

after the execution of the contract with plaintiff, verbally assured plaintiff that Diamond Lake would assist by advancing money toward the cost of the roads. The defendant Palmerton, after the signing of the contract, told plaintiff he would personally help finance plaintiff's road building for up to four years. The exact amount of financing promised by both Diamond Lake and Palmerton was never specified. The written contract contained no provision for financing plaintiff by Diamond Lake.

Subsequently both Diamond Lake and Palmerton either loaned their credit or advanced funds for the benefit of plaintiff. The corporation incurred an obligation of $54,000 to a third party for the building of roads which were plaintiff's obligation under his contract. Palmerton co-signed plaintiff's note for $30,000 to obtain money for road construction. The corporation advanced $19,000 at the end of the 1959 logging season so plaintiff could pay his bills. It purchased culvert pipe for him in an unspecified amount at plaintiff's request. These were in addition to payments made pursuant to the contract for delivered logs. At the time of the breach in question, none of these advances had been substantially repaid by plaintiff. An oral agreement had been made at the end of 1959 that four dollars per thousand board feet of logs delivered would be withheld by Diamond Lake to reimburse it for money advanced for roads, but it appears that Diamond Lake had not availed itself of its right to do so prior to the time of the alleged breach.

The first logs were delivered under the contract in June of 1959. By the summer of 1960 Wampler had expended about $144,000 for roads, somewhat in excess of the financing provided by Palmerton and Diamond Lake. Wampler's financial situation was precarious.

On July 25 he did not receive the entire amount due him for delivered logs. He received the approximate balance on the 27th. Payments in the past had been irregular. He thereafter discontinued most of his operations and requested a meeting with Diamond Lake. At the meeting, held on July 30, 1960, plaintiff said that he needed additional road advances to pay creditors. He also said that in the future the payments for logs must be on time. Plaintiff testified that the defendant Newman then told him that "under the circumstances" he didn't see how Diamond Lake could pay plaintiff any more money. No explanation was offered as to what was meant by Newman or was understood by plaintiff by "under the circumstances." Plaintiff then told his employes that things looked "shaky" and he probably would not get any more money from Diamond Lake. He had outstanding wage claims of about $24,000. He advised his employes to protect themselves by filing liens for their work on the logs. Some did. The contract required plaintiff promptly to satisfy liens filed by his workmen. After their meeting with plaintiff, both defendants met with Diamond Lake's attorney and participated in a decision that Diamond Lake should not make any payment to Wampler on August 10. A payment of about $38,000[1] for logs delivered was not made at that time. In view of the jury verdict this must be treated as an unexcused breach of the contract by Diamond Lake. Approximately one month later, plaintiff filed a petition for voluntary bankruptcy.

Diamond Lake had the funds to make the August 10

---

[1] Diamond Lake and plaintiff subsequently agreed that $19,000 was owing to plaintiff on August 10. However, the figure reflected the deduction of an additional $19,000 to erase the amount of the advance to Wampler made at the end of 1959.

payment. Since Diamond Lake's liabilities exceeded its assets at the close of 1959 and 1960, and since the company incurred a net loss in 1960 of $160,069.84 and had an accumulated deficit of $232,048.37 in December 1960, it is likely that Diamond Lake's financial position was weak on August 10, 1960.

The relevant allegations of plaintiff's complaint are as follows:

"II

"That at all times herein mentioned that Diamond Lake Lumber Company was and is an Oregon corporation. The principal officers, stockholders and persons who were in the actual control of said corporation were Loren Palmerton, * * * Richard Newman. * * *. That said Diamond Lake Lumber Company, * * *, was organized, created, controlled and managed to further the personal purposes, uses, aims and to benefit the within named defendants.

"III

"* * * That said defendants did induce the plaintiff to enter into the said contract with Diamond Lake Lumber Company for the purpose of securing the use and benefit of the plaintiff's assets, credit and reputation, to further the purpose and business of said corporation and to thereby enrich the defendants. That said defendants, while being in control of said Diamond Lake Lumber Company, did thereafter willfully and without just cause for said corporation failed to pay to the plaintiff monies due him, the defendant well knowing that said failure to pay monies due would proximately cause the plaintiff to be unable to meet his current obligations and thereby become bankrupt, thereby depriving the plaintiff of his assets, thereby enriching the Diamond Lake Lumber Company and the defendants and giving to said defendants the benefit of the labor rendered, roads built, services and acts done by the plaintiff. * * *"

Before it can be determined whether plaintiff's proof was sufficient, it is first necessary to establish the nature and elements of a cause of action in tort for interference with a contract, which is the cause of action plaintiff insists he has. The modern action results from the process by which the reach of several ancient remedies was extended. An ancestor of the cause of action is thought to have been the principle of Roman law which permitted the head of a family to sue for harm done by physical violence to a member of his family or his slave.[2] The principle was carried over into early English common law. According to *Bracton,* an action against the person who injured an attendant or serf was given to a lord to protect his interest in not being deprived of the servant's services.[3] Further protection of this sort of interest was deemed necessary when the bubonic plague in the Fourteenth Century created a scarcity of workers. The Ordinance of Laborers[4] was enacted, upon which a cause of action was based for the enticing away of another's servants or workmen regardless whether violence was employed. Gradually, any distinction between the common law action and the statutory action disappeared.[5] The remedy was limited to recovery for enticement of a dependent member of another's household until 1853 when the case of *Lumley v. Gye*[6] decided that the defendant who persuaded an opera singer to break her contract with an opera company

---

[2] Sohm, Institutes of Roman Law (3d ed 1907), § 34.

[3] 2 Bracton, De Legibus Angliae (Tractus 1, folio 115) ch 4 at 233 (Twiss trans 1879).

[4] 23 Edw III (1349). See also, Statute of Labourers, 25 Edw III (1350).

[5] Sayre, Inducing Breach of Contract, 36 Harv L Rev 663, 666 (1923).

[6] 2 El & Bl 216, 118 Eng Rep 749 (Q B 1853).

was liable. In 1893, in *Temperton v. Russell,*[7] the cause of action was extended to cover contracts other than those of employment. The defendant in *Temperton* induced by threats the breach of a contract to furnish building materials.[8]

The interest protected by the interference with contract action is the interest of the individual in the security and integrity of the contractual relations into which he has entered. Economic relations are controlled by contract and the public also has an interest in maintaining the security of such transactions. Therefore the law provides protection.[9] To be actionable an interference must be a knowing and not an inadvertent or incidental invasion of plaintiff's contractual interests.[10]

The relief granted is of the broad type available in intentional tort actions and includes recompense for mental suffering, damage to reputation, and punitive damages.[11] It therefore affords the relief which would have been recoverable from the party breaching the contract and also for the less tangible personal harms such as those sought in the instant case. In this case plaintiff did not seek any damages which would have

[7] [1893] 1 Q B 715 (CA).

[8] A more detailed history of the cause of action may be found in Carpenter, Interference with Contract Relations, 41 Harv L Rev 728, 7 Or L Rev 181, 7 Or L Rev 301 (1928), and Sayre, Inducing Breach of Contract, 36 Harv L Rev 663 (1923). Oregon cases which deal with the general subject of interference with contract but are not of specific application are Sloan v. Journal Publishing Co., 213 Or 324, 360-1, 324 P2d 449 (1958); Bliss v. Southern Pacific Co. et al, 212 Or 634, 651, 321 P2d 324 (1958); Ringler v. Ruby, 117 Or 455, 459-60, 244 P 509, 46 ALR 245 (1926); Phez Co. v. Salem Fruit Union, 103 Or 514, 551, 201 P 222, 205 P 970 (1922).

[9] 1 Harper & James, Torts 490, § 6.5 (1956).

[10] 1 Harper and James, Torts, 492-3, § 6.5 (1956).

[11] Prosser, Torts (3d ed 1964) 973, § 124 nn 44-47.

been recoverable in an action against Diamond Lake for breach of contract, presumably upon the theory that such rights belonged to plaintiff's trustee in bankruptcy.

■ A person who interferes with a contract is not always responsible for the resultant injury. If he is promoting an interest which is equal or superior in social value to that with which he interferes, his actions are said to be privileged or justified.[28] The purpose or motive of the interferor may be the controlling factor in the determination of the existence of justification since it usually discloses the interest involved.

In the usual interference with a contract situation, the person interfering is a complete stranger to the contractual relationship. A complicating ingredient is added where the party induced to breach its contract is a corporation and the third person who induces the breach is not a stranger, but is a person who, by reason of his position with the corporation, owes a duty of advice and action to the corporation. In the instant case, one defendant—Newman—was the President, and the other defendant—Palmerton—was employed as a business adviser of the corporation that was the party to the contract.

A corporation can only act upon the advice of officers or employes and through the actions of agents. Doing business through corporate structures is a recognized and necessary incident of business life. A party is usually able to abandon a disadvantageous but valid contract and be responsible for breach of contract only. Corporations would substantially be prevented from similarly abandoning disadvantageous but valid contracts, and from securing related business ad-

---

[28] Carpenter, Interference With Contract Relations, 41 Harv L Rev 728, 745-6, 7 Or L Rev 301, 301-2 (1928).

vice, if the officers and employes who advised and carried out the breach had to run the risk of personal responsibility in an action for interference with contract. Therefore, courts have tended to shield such persons from responsibility for inducing breach of the corporate contract, often saying that they are not liable if the action was taken in "good faith" and for the benefit of the corporation.[28]

■ It is obvious that if the action or advice is to serve other interests than those of the corporation there can be no immunity because it is not rendered for the purpose which gives birth to the immunity.

The immunity of a corporate officer or employe, who is acting within the scope of his employment and for benefit of the corporation, to interfere with a corporate contract is often spoken of as "privilege."[29] It might well be viewed as a lack of any duty of non-interference on the part of the corporate agent. The person contracting with the corporation cannot reasonably have any contractual expectancy that does not take into consideration the fact that the corporation may be advised to breach the contract, in accordance with its interest, by a person whose duty it is to do so.

In the present case, the action of defendants clearly was taken to benefit the corporation. Plaintiff alleges that the defendants intended, by inducing the corporate breach of contract, to enrich the corporation and thereby indirectly to improve their own financial conditions. We are then faced with the question whether

[28] See, *e.g.*, Nathanson v. Brown & Williamson Tobacco Corp., 189 Misc 1024, 68 NYS2d 914, 920 (S Ct 1947); Said v. Butt [1920] 3 K B 497. See generally, Avins, Liability for Inducing a Corporation to Breach Its Contract, 43 Corn L Q 55 (1957); Ballantine on Corporations (Rev Ed 1946), § 112 at 275-6.

[29] See Avins, Liability for Inducing a Corporation to Breach Its Contract, 43 Corn L Q 55 (1957).

lack of "good faith" exists where the selfish motivation of the corporate official or employe for inducing the corporate breach is to secure derivative benefits from the improved financial condition of the corporation.

■ Most corporate officers or employes have some sort of personal interest in the financial welfare of their principal, even though it may only be a hope of an increase in salary. If "good faith" is equated with the lack of any such selfish interest in enhancing the financial condition of the corporation, most officers or employes would not dare to give the business advice it is their duty to render. We do not believe that "good faith" as used here can reasonably mean anything more than an intent to benefit the corporation.[59]

■ Since the plaintiff alleges that the defendants were acting to benefit the corporation, the motivation attributed to them establishes privilege and is insufficient to render them liable for the tort of interference with a contract. Such is the case even though plaintiff argues that the defendants intended to cause the corporation to take an unfair advantage of the plaintiff by means of the breach of contract.[60] So long as the

[59] Burr v. American National Theatre & Academy, 103 NYS2d 589, 592-3 (Sup Ct), aff'd 278 App Div 908, 105 NYS2d 901 (1st Dept 1951) (personal interest must be adverse to interest of corporation to remove privilege).

[60] Contrary to the conclusion reached by us, it has been held that the existence of an ulterior or dishonest purpose will result in personal liability for the corporate representative for interference with contract even where he acts for the corporation and within the scope of his employment. Remy Beverages v. Myer, 56 NYS2d 828 (S Ct), aff'd 269 App Div 1013, 59 NYS2d 371 (1st Dept 1945). See, however, the subsequent opinion by the same judge, in which it was emphasized that the defendants in Remy Beverages acted for their personal gain in a manner which would not have been beneficial to the corporation. Ehrlich v. Alper, 145 NYS2d 252, 254 (S Ct 1955), aff'd 1 A D 2d 875, 149 NYS2d 562 (1st Dept 1956).

officer or employe acts within the general range of his authority intending to benefit the corporation, the law identifies his actions with the corporation. In such a situation the officer is not liable for interfering with a contract of the corporation any more than the corporation could be liable in tort for interfering with it. The words "good faith" should not be employed to render a corporate officer or employe liable for engaging in morally questionable activities upon behalf of his principal that nevertheless would not be tortious if he were acting for himself as the party to the contract.

■ The interest protected by the interference with contract action is the interest of the plaintiff in not having his contract rights interfered with by intermeddling strangers. However, so long as the person inducing the breach of a corporate contract is an officer or employe acting for the benefit of the corporation and within the scope of his authority, the plaintiff cannot show that this interest was invaded and therefore cannot maintain an interference with contract action.[⑦]

■ On the other hand, there is no reason to protect corporate officers or employes who authorize, direct and participate in tortious conduct by their corporate principal. If the corporation commits a tort as a result of such intentional action on the part of its officers or employes, these agents are also responsible.[⑧] The present question thus reduces itself to whether there is sufficient evidence to make a jury question whether defendants authorized, directed and participated in tortious conduct on the part of Diamond Lake. Because of the privilege, the defendants are not liable

[⑦] Cf Said v. Butt [1920] 3 K B 487.
[⑧] Ballantine on Corporations (Rev Ed 1946) 275, § 112.

in tort for interference with Diamond Lake's contract with plaintiff even though they might have used unfair means to benefit the corporation.[9] Thus the crux of the matter is whether there is evidence that defendants were guilty of engaging in tortious conduct upon behalf of the corporation. The fact that the alleged misconduct by defendants upon behalf of the corporation involved a corporate breach of contract is only incidental.

Plaintiff contends that the failure of Diamond Lake to make the August 10 payment was part of a scheme to obtain for Diamond Lake without payment the roads that Wampler was required to construct under the contract. According to plaintiff, Wampler was first induced to enter the contract and then encouraged, with promises of assistance, to invest all of his money and to utilize all of his credit for construction of the roads. It was planned, according to plaintiff, that the corporation would stop paying Wampler after the roads were substantially completed and before the bulk of the logs were removed. This was done with the motive of avoiding payment for the roads. Plaintiff further asserts that the defendants knew that Diamond Lake's alleged breach of contract would bankrupt the plaintiff, and he appears to suggest that bankrupting the plaintiff would, in some unexplained manner, benefit the corporation and thus defendants.

If, at the time Diamond Lake contracted with plaintiff, defendants had intended that Diamond Lake not pay plaintiff as promised, then defendants

---

[9] For the proposition that the corporate representative who acts for the corporation and within his authority is not personally liable unless his actions are tortious independently of the interference with contract theory, see Greyhound Corp. v. Commercial Casualty Ins. Co., 259 App Div 317, 19 NYS2d 239 (1st Dept 1940).

and Diamond Lake would be liable for the tort of deceit. *Conzelmann v. N.W.P. & D. Prod. Co.*[20] The contract provided that plaintiff would receive certain payments and Diamond Lake failed to make them, but this is not evidence that at the time the contract was made it was intended that Diamond Lake would breach the contract. In *Conzelmann* we said at page 352:

> "A fraudulent intent not to perform a promise may not be inferred as existing at the time the promise is made from the mere fact of nonperformance. Other circumstances of substantial character must be shown in addition to non-performance before such inference of wrongful intent may be drawn. * * *"

There was no evidence from which it could be inferred that at the making of the contract it was intended that Diamond Lake would breach its contract. Plaintiff cannot sustain an action for deceit. Nor does plaintiff contend in his brief that he has any such action.

If Diamond Lake breached the contract solely for the purpose of harming plaintiff and not for the purpose of advancing its self interest there is authority for the proposition that it would be liable in tort for the malicious injury caused.[21] If such action is tortious and defendants instigated it, they would also be responsible. This cause of action is sometimes referred to as "prima facie tort."[22] There is no evidence which indicates that the sole purpose in failing to make the

[20] 190 Or 332, 351, 225 P2d 757 (1950).

[21] Schisgall v. Fairchild Publications, 207 Misc 224, 137 NYS2d 312, 319 (S Ct 1955).

[22] See generally, Forkosch, An Analysis of the "Prima Facie Tort" Cause of Action, 42 Corn L Q 465 (1957); note, Recent Developments in the New York Law of Prima Facie Tort, 32 St. John's L Rev 282 (1958), annot. 16 ALR3d 1191 (1967).

payment was the harm of plaintiff. To the contrary, plaintiff alleges that the purpose was monetary gain.

It might be argued that defendants and the corporation would be guilty of *prima facie* tort if they caused the breach of contract for the purpose of obtaining for Diamond Lake without payment the value of the plaintiff's road construction. Some claim that an actual intent to harm is not a necessary element of *prima facie* tort.[9] It is unnecessary for us to express an opinion whether a breach made with such intent is sufficient to sustain a *prima facie* tort action against Diamond Lake and the defendants because we believe evidence of such intent to be lacking.

As in almost all cases in which intent is in issue, there is no direct evidence of any bad motive or intent. Hence, it is necessary to ascertain whether there is sufficient circumstantial evidence of it.

The relationship between Diamond Lake and Wampler under their contract was such that, once Wampler constructed any roads, Diamond Lake would be able to utilize them whether it paid him and whether their contract relationship continued. Defendants did encourage plaintiff to fulfill the contract and build the roads. Diamond Lake did fail to pay Wampler on August 10 and did utilize the roads thereafter. Funds were available for payment. Such facts, however, are too equivocal to constitute proof of an intent to obtain for nothing the roads constructed by plaintiff by bankrupting plaintiff. It probably was known that Diamond Lake's failure to pay plaintiff might bankrupt him. Knowing that an act may bring

---

[9] Note, Prima Facie Tort Doctrine, 52 Col L Rev 504 at 505-8 (1952). But see discussion of cases cited in Comment, Recent Developments in the New York Law of Prima Facie Tort, 32 St. John's L Rev 282, 288-9 (1958).

about a result is quite a different thing from actually intending to bring it about. The facts shown are perfectly consistent with the conclusion that the non-payment in August was motivated solely by ordinary business considerations. One such consideration could have been defendants' fear that plaintiff was or was becoming unable to pay its bills and that Diamond Lake would have to pay off liens on its logs. It is extremely difficult to imagine that the defendants, who were experienced businessmen, could have really thought that Diamond Lake could benefit from bankrupting the plaintiff. The bankruptcy would serve to insure that Diamond Lake would be sued by the trustee in bankruptcy and forced to pay plaintiff's creditors for the road work done. In addition, a good part of the money invested in roads by plaintiff had been advanced by Diamond Lake and Palmerton. More substantial evidence than has been offered would be required to prove the existence of such an unlikely intent.

Defendants offered assistance to plaintiff with respect to road construction, and undoubtedly realized that he would be unable to build the roads without help. This assistance was not part of Diamond Lake's contract obligation. Nor does plaintiff contend that Palmerton or Newman were under any contractual obligation to him. Defendant Palmerton and Diamond Lake did provide substantial financial assistance but not all that plaintiff needed. These facts, too, are as consistent with an honest effort to assist Wampler in fulfilling his obligations under the contract as with an attempt to cheat him. Certainly defendants could not be accused of an intent to defraud for failing to furnish unlimited financing.

The evidence relating to an intent to take an unfair advantage of plaintiff by bankrupting him is so

equivocal and insubstantial that it is insufficient to pose a question of fact for the jury. Regardless of the name attributed to the alleged conduct of defendant and Diamond Lake, it smacks of double-dealing and fraud. Claims of this nature can only be proven by "circumstances of substantial character." *Conzelmann, supra.* It was not so in this case.

We know of no other tort theory under which it could be contended that defendants were liable to plaintiff because of Diamond Lake's breach of contract. The trial court erred in failing to grant the defendants' motion for a directed verdict.