Argued and submitted February 6, affirmed in part, reversed in part
and remanded September 18, petition for rehearing
denied November 20, 1979

STRAUBE,
*Appellant/Cross-respondent,*

*v.*

LARSON, et al
*Respondents/Cross-appellants.*

(No. 402-227 SC 25191)

600 P2d 371

[358]

[358-a]

Richard E. Alexander, of Davies, Biggs, Strayer, Stoel & Boley, Portland, argued the cause for appellant/cross-respondent. With him on the briefs was Preston C. Hiefield, Jr., of Williams, Stark, Hiefield, Norville & Griffin, P. C., Portland.

William L. Hallmark, Portland, argued the cause for respondents/cross-appellants Larson, Seapy and Helm. With him on the briefs were William A. Davis, and Jones, Lang, Klein, Wolf & Smith, Portland.

Elizabeth K. Reeve, Portland, argued the cause for respondent/cross-appellant English. With her on the briefs were A. Allan Franzke, J. Laurence Cable, Ridgway K. Foley, Jr., and Souther, Spaulding, Kinsey, Williamson & Schwabe, Portland.
Before Denecke, Chief Justice, and Holman, Howell, Bryson,* Lent, and Linde, Justices.

HOLMAN, J.

---

*Bryson, J., retired April 1, 1979.

## HOLMAN, J.

This is an action for damages brought by a medical doctor against the chief administrator of Emanuel Hospital as well as another medical doctor and two residents in training in radiology at the hospital, charging a successful conspiracy by the defendants to deprive plaintiff of his staff privileges in the hospital. Plaintiff appeals from a summary judgment for defendants.

Plaintiff is a radiologist and was a partner in a firm of radiologists, Lloyd Center X-ray. The partners were employed by the hospital as the sole persons doing the hospital's radiology work. As a member of the hospital staff, plaintiff was in charge of radiology education for interns and residents. Defendant Larson was the administrator of the hospital. Defendant English was a radiologist working at the hospital who was employed by the firm of which plaintiff was a partner. Both plaintiff and English were members of the hospital's medical staff. Defendants Seapy and Helm were radiology residents in training at the hospital who were employed by the hospital, and who were paid by Lloyd Center X-ray for some week-end work at the hospital.

On January 30, 1973, Larson, as chief executive of the hospital, summarily suspended plaintiff's hospital staff privileges "in the best interest of patient care." Pursuant to hospital bylaws and regulations, this action was temporary and subject to review by a hearing before the Medical Staff Executive Committee (executive committee) and subject to review and hearing before a review committee before final action by the Board of Directors (board) of the hospital. The executive committee sustained the suspension and continued it until a later date. The review committee held hearings and recommended to the executive committee that the suspension not be affirmed and be lifted. This recommendation was not accepted by the executive committee which then made the suspension

[359]

permanent and the board affirmed the action of the executive committee on January 24, 1974. This action followed.

Plaintiff's cause of action rests upon the theory of the wrongful interference by defendants with plaintiff's business relationship with the hospital. Plaintiff being a member of the firm which had the contract to do the hospital radiology work, suspension of plaintiff's staff privileges interfered with his performance of that contract. Aside from this contract, he had a business relationship with the hospital that afforded him with a base from which to practice his specialty, which relationship was terminated.

 Before this court can decide whether, as plaintiff contends on appeal, the granting of the summary judgment was improper because he had tendered a prima facie case entitling him to its submission to a jury,[1] we must determine what plaintiff must prove to make out a cause of action. Modern decisions of this court concerning interference with economic relationships commence with *Wampler v. Palmerton,* 250 Or 65, 439 P2d 601 (1968), and end with *Top Service Body Shop v. Allstate Ins. Co.,* 283 Or 201, 582 P2d 1365 (1978). Intentional interference in pursuit of an improper objective or the use of wrongful means of interference that in fact cause injury to a plaintiff's professional or business relationships usually gives rise to a tort claim. Interference with a business relationship is an intentional tort. If the person whose actions interfere does not have the intent to cause the

[1] Summary judgment against plaintiff was proper if the record before the court showed that there was "no genuine issue as to any material fact" and that defendants were "entitled to a judgment as a matter of law." ORS 18.105(3). The word "any," as used in that subsection, is ambiguous. It could be contended that the literal language of subsection (3) prohibits summary judgment if there are any factual disputes, even though several elements of plaintiff's case are indisputably to be resolved against him. It is more reasonable to read the subsection to require summary judgment if any of the material facts is undisputed and the resolution of that issue entitled the moving party to judgment as a matter of law, and we so read it. Accordingly, we will not reverse merely because plaintiff is able to show that some factual issues are still disputed.

result, his conduct does not subject him to liability. However, even if he does not act for the purpose of interfering or does not desire it but knows that the interference is substantially certain to occur from his action and is a necessary consequence thereof, his interference is intentional as contemplated by the rule. Restatement (Second) of the Law of Torts § 766, comments *(h)* and *(j)*.

■ ■ In *Top Service* we decided that the defendant's improper intent, motive or purpose to interfere was a necessary element of the plaintiff's case, rather than a lack thereof being a matter of justification or privilege to be asserted as a defense by defendant. Thus, to be entitled to go to a jury, plaintiff must not only prove that defendant intentionally interfered with his business relationship but also that defendant had a duty of non-interference; *i.e.,* that he interfered for an improper purpose rather than for a legitimate one, or that defendant used improper means which resulted in injury to plaintiff. Therefore, a case is made out which entitles plaintiff to go to a jury only "when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself." 283 Or at 209.

■ Plaintiff introduced in evidence the transcripts of testimony before the executive and review committees, which transcripts defendants contend may not be used as evidence in this case because the evidence has been proscribed by statute. A plaintiff makes a jury case by submitting evidence of the defendant's testimony in the original hearing (such as the hearing before either the executive committee or the review committee) to certain claimed facts which were detrimental to plaintiff and which are a basis for the action taken against him, and then testifying himself in his action for interference contrary to defendant's testimony in the original hearing. From this the jury can conclude that the defendant lied in his testimony about plaintiff which resulted in the action taken

[361]

against him at the original hearing and infer therefrom an improper motive (to injure plaintiff) on defendant's part. As a result, plaintiff has it within his ability almost always to make out a case for submission to the jury. Realizing this, and recognizing the difficulty in securing witnesses in proceedings for the discipline of medical staff in hospitals because the witness may be faced with an action by the person whose conduct is in question that will almost certainly go to a jury, the legislature enacted ORS 41.675, which provides, in part, as follows:

> "* * * (1) As used in subsection (2) of this section 'data' means written reports, notes or records of tissue committees or other medical staff committees in connection with the professional training, supervision or discipline of the medical staff of hospitals, and any written reports, notes or records of similar committees of professional societies in connection with training, supervision or discipline of physicians. The term includes the written reports, notes or records of utilization review and professional standards review organizations.
>
> "(2) All data shall be confidential and shall not be admissible in evidence in any judicial proceeding, but this section shall not affect the admissibility in evidence of records dealing with a patient's hospital care and treatment.
>
> "(3) A person serving on or appearing before any medical review committee shall not be examined as to any communication made before that committee or the findings thereof.
>
> "* * * * *."

The executive and the review committees that held the hearings in this case were "medical staff committee[s] in connection with the * * * discipline of the medical staff of hospitals." It would therefore seem that subsections (1) and (2) of ORS 41.675 apply to the transcripts of testimony before those committees. Further, there is no reason to suppose that the "medical review committee" referred to in subsection (3) of ORS 41.675 applies to different kinds of committees from those described in subsection (1).

[362]

Plaintiff's answer to this reasoning is that despite the broad language of the statute, the legislature only intended the statute to apply to "tissue committees," which meet to discuss the treatment of patients. The discussions at such committee meetings, to be of any value, must be frank, even brutal, and if the discussions of the staff at such meetings were admissible in malpractice actions or other litigation, they would probably not be as frank.

Our examination of the legislative history shows that the chief emphasis was indeed on protecting the confidentiality of tissue committee discussions; however, the history does not explain why the legislature went on to add "other medical staff committees in connection with the professional training, supervision *or discipline* of the medical staff of hospitals * * *." (Emphasis added.) Had the legislature only intended to protect tissue committees, it need not have added the other language. Further, there is no indication in the legislative history that the statute was not intended to cover disciplinary committees such as those in this case.[2] Therefore, plaintiff may not use the records made in the hospital disciplinary proceedings nor may any person who testified in those proceedings "be examined as to any communication made before that committee or the findings thereof." Application of the statute makes plaintiff's task much more difficult.

Plaintiff also argues that subsection (3), even if applicable, should not apply to this case because the subsection was not adopted until after the committee hearings were held. Assuming that this is correct, the

---

[2] ORS 41.675, as originally passed in 1963, only contained parts of the present subsections (1) and (2). Oregon Laws 1963, ch 181, § 1. The "professional societies" provision was added in 1971. Oregon Laws 1971, ch 412, § 1. Subsection (3) was added in 1975 as part of the legislature's general malpractice and malpractice insurance legislation. Oregon Laws 1975, ch 796, § 11. At that time, Representative Frohnmayer pointed out that the term "medical review committee" was not defined, and for that and other reasons he opposed the subsection. Minutes, House Judiciary Committee, May 1, 1975, at 8-9. The subsection was nevertheless adopted, without defining "medical review committee."

provisions of subsections (1) and (2) would appear to accomplish the same result as subsection (3). It would not make sense to keep the transcript of the committee hearings confidential and then to permit the witnesses at those hearings to be questioned concerning what they said there. To permit such questioning would entirely negate the intended effect of subsections (1) and (2).

■ Plaintiff also argues that most evidentiary privileges are based on confidentiality; that the presence of third parties destroys the confidentiality and thus the privilege; and that the executive committee allowed third parties (a court reporter and plaintiff's attorney) to be present at the hearing. Plaintiff asserts that the committee thereby waived the privilege. However, the privilege in this case is based not on confidentiality but on the need to encourage frank communication. It is not to preserve the privacy of the communication but to prevent the participants from incurring legal liability for what they say. Thus, the presence of third parties at the hearing is irrelevant.

■ ORS 18.105(4) provides that affidavits presented to aid a decision on summary judgment "shall be made upon personal knowledge, shall set forth facts which would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Under the Federal Rules from which Oregon's summary judgment rule was adopted, depositions must set forth such facts as would be admissible in evidence and the deponent must have personal knowledge of that to which he testifies. *Liberty Leasing Co. v. Hillsum Sales Corporation,* 380 F2d 1013 (5th Cir 1967). There seems to be no reason why the Oregon rule should be different.

■ Having established the ground rules for that which plaintiff must prove to present a prima facie case and the limitations upon the evidence that may be used to prove it, we proceed to the sixty-six depositions plus numerous affidavits that have been submitted for the

purpose of determining whether plaintiff tenders a jury issue.

The radiology department at the hospital had been in turmoil for some time. The head of the department had been ill for a considerable length of time and finally resigned. Facilities were crowded and business was increasing. There had been some conflict between the head of the department and plaintiff. Upon resignation of the department head, plaintiff was the next senior individual who was principally engaged with Lloyd Center X-ray's hospital practice, but he was not appointed as department head. Rather, one of plaintiff's partners, Dr. Haugen, who was considerably junior to plaintiff, was appointed. Many technicians in the department were unhappy with plaintiff, and about 12 of them in a group called upon Larson to complain of plaintiff. There were complaints that plaintiff was habitually late for special procedures and that patients and hospital personnel were kept waiting. One of the technicians had been instructed to keep a record of plaintiff's tardiness. Plaintiff learned of this and had been unpleasant in his questioning of subordinates about it.

Defendants Seapy and Helm were dissatisfied with the training they were receiving as residents, contending it was inadequate and that others were being given preference in training by plaintiff to defendants' detriment. A report had been made to the medical association which indicated that Seapy may have practiced medicine without an Oregon license, and Seapy felt that plaintiff was responsible for this. He also complained to the over-all director of medical education that plaintiff had attempted to keep him from special education with the Air Force because he would not recommend him as being qualified. Plaintiff had been extremely angry at both Seapy and Helm and had reprimanded them because they took 45 minutes off and attended a fracture conference at the hospital. They felt their position at the hospital was continually threatened by plaintiff.

[365]

Larson and plaintiff had clashed over plans for the physical enlargement of the radiology facilities at the hospital. Plaintiff indicated that he was the only one on the staff who had the intestinal fortitude to stand up to Larson. There was friction between plaintiff and his partner, Dr. Haugen, who had been given preference as head of the department over plaintiff. Dr. English, who was employed by Lloyd Center X-ray and who worked at the hospital, thought that plaintiff was attempting to discredit Dr. Haugen, that he would not cooperate with Haugen after Haugen was appointed department head, that he was not fair to Seapy and Helm, and that he kept the department in a turmoil. In all, plaintiff antagonized a considerable number of people in the radiology department who were critical of him. There was never any question about plaintiff's technical proficiency.

Plaintiff testified that English, Seapy and Helm all had expressed an interest in becoming members of Lloyd Center X-ray and that they had been told by him that they were not acceptable. He claims that from this interest and their subsequent criticism of him it should be inferred that they desired to remove his staff privileges in order to prevent his continuing as a member of the partnership because he was a block to their ambitions. However, terminating plaintiff's staff privileges did not terminate his partnership position in Lloyd Center X-ray, which performed services for others as well as for the hospital. In addition, plaintiff also testified that after his suspension he asked Seapy and Helm, when together, if they would be interested in joining the Lloyd Center X-ray partnership. He testified that Helm said he was interested but that Seapy said he was not. This seems contrary to his avowed belief that they conspired to have his privileges suspended because they wanted to get rid of him to make room for themselves. When asked about the reason for this latter conversation, he indicated he was just testing them.

[366]

There is no testimony that English complained to Larson about plaintiff and, therefore, there is no proof that he caused plaintiff's summary temporary suspension by Larson. There was evidence that English complained to others about plaintiff's actions and that Larson was aware of the problems between plaintiff and the radiologists and residents in the department, but no evidence that this information came to Larson as the result of English's complaints. As previously stated, English's testimony before the hospital committees may not be used to show he caused the permanent suspension.

Neither is there any admissible evidence from which it can be inferred that Helm caused Larson to suspend plaintiff. While Helm complained, there is no evidence that he ever complained to Larson about plaintiff prior to the summary suspension. Larson testified that he knew of the residents' complaints because he "heard the problem from the residents." However, there were other residents than Helm and there was testimony that Seapy had complained to Larson. Without further testimony, it cannot be inferred that Helm's complaints caused Larson to summarily suspend plaintiff. Again, his testimony before the hospital committees may not be used in an action against him.

There is evidence, other than from the hospital hearings, that Seapy complained directly to Larson about plaintiff's deleterious effect upon patient care and that he related to Larson an occurrence in which Seapy claimed plaintiff deliberately delayed another doctor from using the hospital facilities for the benefit of a critically ill patient. Plaintiff denied that he intentionally delayed the other doctor's treatment of his patient. Seapy did not make this complaint until 14 months after the occurrence. In the interim there had occurred, by his own testimony, many things from which a jury could find he developed an intense dislike of plaintiff. It is our conclusion that from this evidence

[367]

■■■■■■

a jury could find that Seapy's complaints were a cause of Larson's summary suspension of plaintiff, that they were motivated by a desire to "get even" with plaintiff because of plaintiff's past mistreatment of him, and that there was no basis for a claim that plaintiff had intentionally delayed the use of the facilities by the other doctor.

As indicated, the rule requires that a defendant intentionally interfere with a plaintiff's contract. In the present case it has not been shown that Seapy specifically intended to have plaintiff's staff privileges taken from him or that he even knew such a proceeding was possible. However, it could be concluded that he intended to have plaintiff disciplined; had he intended otherwise, there would have been no object in going to Larson for the specific purpose of making a complaint. It would not seem, in order to have a cause of action, that it should be necessary for Seapy to have contemplated or to have had knowledge of the particular kind of discipline that was within Larson's power to inflict.

There is evidence, other than from the hospital hearings, that Larson and plaintiff had previously clashed over the physical restructuring of the x-ray department's quarters and that Larson told others at the time of plaintiff's suspension that one of the principal reasons he suspended plaintiff was because a considerable number of the technicians indicated, at the time the group called upon him, that they were going to quit if plaintiff continued to work in the department. There was also evidence, other than the record of the hospital hearings, from which it could be determined that, in fact, no technician had so indicated to Larson. Therefore, the jury could find that Larson lied about one of the principal reasons he gave for summarily suspending plaintiff and could infer therefrom that he had an improper purpose or he would not have lied concerning it. We suggest not that

the evidence compels such inferences but only that it suffices to present an issue of fact for a jury.[3]

Both Larson and Seapy contend that plaintiff's evidence does not overcome their defense of justification or privilege because of (1) their right to interfere in the interest of the hospital and (2) their right to interfere in the public interest. They point out that they are employees of the hospital and owe a duty to take action if the hospital's interest in patient care is thwarted. In *Wampler v. Palmerton, supra,* we said, as follows:

"A person who interferes with a contract is not always responsible for the resultant injury. If he is promoting an interest which is equal or superior in social value to that with which he interferes, his actions are said to be privileged or justified. The purpose or motive of the interferor may be the controlling factor in the determination of the existence of justification since it usually discloses the interest involved.

"In the usual interference with a contract situation, the person interfering is a complete stranger to the contractual relationship. A complicating ingredient is added where the party induced to breach its contract is a corporation and the third person who induces the breach is not a stranger, but is a person who, by reason of his position with the corporation, owes a duty of advice and action to the corporation. * * *.

"* * * [C]ourts have tended to shield such persons [employees] from responsibility for inducing breach of the corporate contract, often saying that they are not liable if the action was taken in 'good faith' and for the benefit of the corporation.

---

[3] Larson did not have any authority by his summary suspension to deprive plaintiff permanently of his staff privileges. He could suspend them only until the hospital could conduct hearings and make a decision. The question has not been raised, and we take no position concerning it, whether a decision to deprive plaintiff permanently of his privileges by the governing bodies of the hospital, after their consideration of all the evidence, limits defendants' liability to the damages caused by the temporary suspension, despite the probability that there would have been no hospital hearings had Larson not invoked the temporary suspension.

> "It is obvious that if the action or advice is to serve other interests than those of the corporation there can be no immunity because it is not rendred for the purpose which gives birth to the immunity." 250 Or at 74-75. (Footnotes omitted.)

The issue is whether the evidence demonstrates that the actions of Larson and Seapy were taken for the benefit of the hospital or whether they were taken to satisfy private grudges. We submit that the evidence previously discussed creates a question of fact on this issue, and there is no basis for justification or privilege as a matter of law unless there is an absolute privilege.

█ Defendants contend there is such an absolute privilege because the hearing was quasi-judicial, citing two libel cases,[4] *Ramstead v. Morgan,* 219 Or 383, 387, 347 P2d 594 (1959), and *Moore v. West Lawn Mem. Park,* 266 Or 244, 249-50, 512 P2d 1344 (1973). *Ramstead* concerned a complaint to a bar grievance committee about a practicing lawyer, and *Moore,*a complaint to the State Board of Funeral Directors and Embalmers about an applicant for a license. In each instance it was held that the communication was absolutely privileged. In *Ramstead* the court said that

> "* * * 'there are certain relations of life in which it is so important that the persons engaged in them should be able to speak freely that the law takes the risk of their abusing the occasion * * *.' " 219 Or at 387, quoting *Moore v. Weaver,* 2 KB 520, 521 (1928).

All of the many modern cases cited in *Ramstead* were complaints made to or hearings before governmental or quasi-governmental bodies which had authority to investigate and take some action which would cause government authorized action, as, for example, the revocation or granting of governmentally authorized

---

[4] It can be contended that libel cases are relevant because, as stated by Prosser, Law of Torts at 926 (4th ed): "Defamation, interference with contract, injurious falsehood, and the broader tort of interference with prospective economic relations, all are different phases of the same general wrong of depriving the plaintiff of beneficial relations with others."

licenses as in *Ramstead* and *Moore.* In dicta in *Ramstead* the court pointed out four cases, the most recent of which is now one hundred years old, which indicated that an absolute privilege might exist in communications made to private organizations. However, it is our conclusion that usually there should not be an absolute privilege granted to any employee of a private employer concerning action taken for private improper motives, as is claimed in the situation of Larson; nor should there be absolute privilege for an intentionally untrue statement made about a third party by an employee for his own purposes to his private employer, as is claimed in the situation of Seapy. It is true that care of patients in hospitals is of great importance and of vital concern to everyone. However, private businesses of many kinds, such as processors of food and manufacturers of drugs, automobiles and other potentially dangerous contrivances, similarly have public importance to general welfare and are of public concern or interest. There are no logical terminal facilities for the application of absolute privilege if applied as defendants suggest.

Defendants urge that there is a qualified privilege. The rule we have applied, which denies an action for interference when made in good faith for a proper purpose, amounts to the application of a qualified privilege, with the burden of negating this qualified privilege placed upon plaintiff as part of his affirmative case.

The next issue is whether plaintiff made a sufficient showing of conspiracy to allow the two other defendants to be held liable for Larson's and Seapy's acts. We conclude that he did not. Plaintiff's discussion of this matter consists of a series of citations for the proposition, which we do not contest, that conspiracy is very difficult to prove. His discussion of the evidence does not persuade us that there is an issue of fact on the conspiracy allegation. Some of the evidence on which he relies is inadmissible under ORS 41.675.

Some of it, such as the conclusions by members of the executive committee that there was a possibility of a conspiracy or that some of the technicians (*not* defendants) testified "as if by script," are either inadmissible as conclusions unsupported by any first-hand knowledge or are irrelevant as not suggesting any misconduct by these defendants. Similarly, the fact that one of the technicians kept "secret notes" on plaintiff is irrelevant, absent some indication that one of the defendants ordered the notes taken, which was specifically denied by all the defendants and by the technician. All that remains is plaintiff's assertion that defendants discussed plaintiff among themselves, with his conclusion, presumably, that these discussions were conspiratorial. We agree with the trial court that plaintiff's evidence is simply insufficient to create a genuine issue of material fact on the conspiracy allegation.

■ Defendants call to our attention that subsequent to the granting of the summary judgments in favor of defendants in this case and during the pendency of this appeal, the trial judge in the companion case of *Straube v. Emanuel Lutheran Charity Board, a Corporation, dba Emanuel Hospital,* held that there were adequate grounds for the suspension of plaintiff and that the hospital was not responsible to plaintiff because of the suspensions. While defendants do not specifically say so, in effect, what they are suggesting is a form of collateral estoppel. They claim the hospital can only be responsible for the suspension of plaintiff as the result of the actions of Larson, and that there can be no question but that in temporarily suspending plaintiff Larson was acting in the course of his employment. Therefore, they reason that the subsequent finding that the hospital had adequate grounds for the suspension of plaintiff is the equivalent of a finding that Larson had adequate grounds, and this finding cures any prior error that may have been committed by the trial judge in granting defendants summary judgments in this case.

The difficulty with defendants' position, if well taken, is that the decision in the other case upon which the claim of an estoppel is based did not occur until after the summary judgments in this case were granted at the trial level and therefore cannot be considered here. In *Lantis v. Lantis,* 239 Or 126, 396 P2d 755 (1964), it was contended that a Nevada divorce decree worked an estoppel against plaintiff on an appeal from a decree enforcing a property settlement, even though the Nevada divorce decree was entered subsequent to the decree enforcing the property settlement. We said:

> "The complaint for divorce in Nevada was filed after the complaint was filed in the instant case. And this case was decided by the trial court prior to the date of the Nevada decree. What effect, if any, the Nevada proceeding may have had upon the instant case we do not decide. We hold that the issue is not before us. It appears to require repetition that this is a court of review. We pass upon only the questions presented to us and decided by the trial court. The record before us fails to show that any of the issues argued here were pleaded or presented to the trial court." 239 Or at 129.

This case is being sent back for further proceedings as to Larson and Seapy. If an estoppel has occurred, it can be asserted at the trial level by a supplemental pleading prior to trial.[5]

■ On cross-appeal, defendants contend that the trial court erred in refusing to award them costs for taking depositions. ORS 20.020 provides:

> "A party entitled to costs shall also be allowed for all necessary disbursements, including * * * the necessary expenses of taking depositions * * *."

We first considered ORS 20.020 with respect to depositions in *Kendall v. Curl et al,* 222 Or 329, 339-40, 353 P2d 227 (1960), where we said:

---

[5] The determination of the trial court in the case of *Straube v. Emanuel Lutheran Charity Board, a Corporation, dba Emanuel Hospital,* was affirmed by this court this day. 287 Or 375, 600 P2d 381 (1979).

"* * * Necessary depositions are depositions to preserve testimony. A discovery deposition, which may be necessary for a few pages, usually runs to an extent which is a luxury. Such a deposition can become a necessity if a witness disappears.

"* * * * *.

"The trial judge, who is in the best position to decide whether a deposition is, or has become, necessary, should approve the charge or a part of the charge for a deposition actually used or taken in good faith for testimonial purposes. Ordinarily, the matter is left to the discretion of the trial judge. * * *"

*See also American Sanitary Service v. Walker,* 276 Or 389, 395, 554 P2d 1010 (1976); *Baumbach v. Poole,* 266 Or 154, 161, 511 P2d 1219 (1973). ORS 20.020 was passed before the summary judgment statute, and the latter contains no guide for the cost problem. It may certainly be argued that in the context of summary judgments, depositions are necessary, being the basis for the judge's decision in many cases. However, *Kendall* emphasizes that ORS 20.020 is intended to allow expenses of depositions that are used or intended to be used at trial. *Kendall* also states that allowing recovery for discovery depositions would increase counsel's tendency to take too many depositions (in this case there were 66 depositions for the court's use on summary judgment). Since all depositions are potentially relevant in the trial court's determination of whether to grant summary judgment—see ORS 18.105(3)—allowing recovery in this context would encourage the multiplication of depositions that *Kendall* sought to avoid. We hold that the trial judge did not err in refusing to award costs for the taking of depositions.

The decision of the trial court is affirmed in part, reversed in part, and the case is remanded for trial against defendants Larson and Seavy.