**MULTNOMAH LEGAL SERVICES WORKERS UNION, Plaintiff,**

**and**

**National Organization of Legal Services Workers; District 65, UAW, Plaintiff,**

v.

**MULTNOMAH COUNTY LEGAL AID SERVICE, INCORPORATED, a Nonprofit Oregon Corporation, Defendant,**

v.

**LEGAL SERVICES CORPORATION, A Nonprofit District of Columbia Corporation, Defendant.**

**CV No. 89–464–PA.**

United States District Court, D. Oregon.

Oct. 6, 1989.

Don S. Willner, Rosemarie Cordello, Don S. Willner & Associates, Portland, Or., for plaintiff.

Calvin L. Keith, Benjamin J. Brownfain, David A. Bledsoe, Perkins Coie, Portland, Or., for defendant Legal Services Corp.

Robert C. Weaver, Peter J. Burger, Garvey, Schubert & Barer, Portland, Or., for defendant Multnomah County Legal Aid Service, Inc.

PANNER, Chief Judge.

Plaintiffs National Organization of Legal Services Workers, District 65, UAW, and Multnomah Legal Services Workers Union (Union) bring this action for injunctive relief against defendants Multnomah County Legal Aid Services, Inc. (MCLAS), and Legal Services Corp. (LSC). Plaintiffs seek an order (1) enforcing the arbitration decision interpreting the collective bargaining agreement (CBA) between the Union and MCLAS; (2) requiring MCLAS to comply with the arbitration decision; and (3) prohibiting LSC from requiring MCLAS to release employee personnel files or information contained in personnel files without the employees' consent, and prohibiting LSC from conditioning MCLAS funding on the release of personnel files.

LSC cross-claims against MCLAS, seeking an order that MCLAS perform its contract with LSC by providing access to all personnel files. LSC also cross-claims and counterclaims for a declaratory judgment that MCLAS has a statutory and contractual duty to provide LSC with employee personnel files and to require all MCLAS employees to cooperate with LSC's monitoring and auditing.

Court trial was July 17, 1989. At trial, I allowed LSC ten days to respond in writing to my question on whether LSC will cut off MCLAS funding solely because of the position MCLAS takes in this litigation. LSC responded to my request on July 27, 1989, and MCLAS replied on August 3, 1989.

I grant judgment for plaintiffs. I deny judgment for LSC. These are my findings of facts and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

## FINDINGS OF FACT

This dispute stems from LSC's demand to review the personnel files of MCLAS employees Stelle Kednay, a bookkeeper, and Donna Fausnaught, a receptionist, who are Union members. LSC demanded access to these files based on its statutory mission to monitor legal aid programs that receive money from LSC. However, the CBA prohibits MCLAS from releasing the personnel files of Union members except by consent or court order. MCLAS, forced to choose between breaching the CBA and disobeying LSC, decided to release the personnel files to LSC. Plaintiffs then brought this action.

### I. *Background*

MCLAS, which employs fifteen attorneys, ten paralegals, and eleven support workers, provides legal services to 7,000 indigent clients a year. LSC supplies about half of MCLAS's $1.2 million annual budget. As a condition of receiving money from LSC, MCLAS has agreed to

cooperate with all information collection, including surveys, questionnaires, monitoring, audit and compliance evaluation

activities undertaken by [LSC] ... and give [LSC] ... access to and copies of all records, books, papers and documents in the possession, custody or control of [MCLAS] except for that properly subject to the attorney-client privilege.

Grant Assurance Agreement, § 7, Defendants' Exh. 150, at 4. MCLAS also agreed to "require all of its employees to give full cooperation to [LSC] personnel engaged in monitoring and/or auditing and/or conducting compliance investigations regarding" MCLAS. *Id.*

The Union has represented MCLAS attorneys and staff since 1984. The CBA provides:

> No information from an employee's personnel file shall be released without the employee's consent, except pursuant to court process.

CBA, § 26.6, Plaintiffs' Exh. 13, at 29.

The MCLAS personnel files usually contain the following employee documents: (1) resumes; (2) information sheets; (3) records of starting date, position, salary, and termination; (4) benefit forms; (5) W–4 forms; (6) personnel evaluations; (7) salary adjustment memos; (8) hiring memos; (9) formal disciplinary actions; (10) formal grievances; (11) employment verification request forms; and (12) I–9 (Immigration Service Verification) forms. Items (2), (11), and (12) are available only from personnel files.

LSC is a private nonprofit District of Columbia corporation established by Congress to distribute money to legal aid programs. 42 U.S.C. §§ 2996a and 2996e(a)(1). Congress requires LSC to "monitor and evaluate and provide for independent evaluation" of legal services programs that receive LSC money. *Id.* at § 2996f(d). LSC may

> prescribe the keeping of records with respect to funds provided by grant or contract and shall have access to such records at all reasonable times for the purpose of insuring compliance with the grant or contract or the terms and conditions upon which financial assistance was provided.

*Id.* at § 2996g(b). LSC also may

> insure the compliance of recipients and their employees with the provisions of [the Legal Services Corporation Act], and the rules, regulations, and guidelines promulgated pursuant [to this Act], and to terminate, after a hearing in accordance with [42 U.S.C. § 2996j], financial support to a recipient which fails to comply.

*Id.* at § 2996e(b)(1)(A).

In fiscal years 1987 and 1988, the Senate Appropriations Committee required that during monitoring by LSC, "[r]equests for production of documents and other materials [be] reasonable and pertinent." Plaintiffs' Trial Brief, Exh. 2, at 3. Senator Alan Cranston explained why the Committee imposed this and other requirements on LSC:

> The Senate Appropriation Committee has, for 2 years in a row, in its committee reports accompanying the annual appropriation, directed [LSC's] staff to revise its monitoring procedures to halt the harassment and undue delays that have permeated the conduct of these visits to local programs.

S.Res. 421, 100 Cong., 2d Sess., 134 Cong. Rec. S4795 (daily ed. April 26, 1988).

LSC drafted guidelines requiring that monitors review "necessary and appropriate materials which provide information on the recipient's delivery of services, budget, and compliance with all applicable law," and "pertinent files for required documentation and for purposes of verifying the accuracy of information provided to LSC." LSC Monitoring Handbook, Plaintiffs' Exh. 6, at 17.

An internal LSC document, "Access to Documents," requires that monitors determine that a document request is "both necessary and reasonable." Plaintiffs' Exh. 7, at 3. LSC has no written policies for determining whether a document request is necessary and reasonable, or when personnel files must be reviewed.

The LSC Board of Directors requires the LSC president to issue "a written prelimi-

nary determination of grounds for suspension of financial assistance" five working days after the LSC president learns that a recipient has "by refusal or by invitation to negotiate or by any other means" failed to produce "any material, in whole or in part, at the Corporation's request." Plaintiff's Exh. 7, Access to Documents, at 2. The LSC president must issue such a determination unless the president determines that LSC "has no right to the requested information" under applicable statutes, regulations, and guidelines. *Id.*

## II. *LSC's Monitoring of MCLAS*

LSC monitored MCLAS in October 1985 and July 1987. Both monitoring reports were favorable, emphasizing the high quality of MCLAS's legal work.

During the previous monitoring visits, LSC did not review personnel files. An LSC monitor randomly selected employees' names and asked the program administrator about documents in the personnel files. The administrator described the documents and answered the LSC monitor's questions. The LSC monitor did not actually see the personnel files.

On January 27, 1989, LSC notified Savage that it would "conduct an on-site monitoring review" of MCLAS. Defendants' Exh. 157, at 1. LSC requested twenty-nine documents, which MCLAS supplied.

Before the April 1989 monitoring visit to MCLAS, Ada Shen–Jaffe, executive director of Evergreen Legal Services in Seattle (Evergreen), warned Louis Savage, executive director of MCLAS, that LSC had requested the personnel files of union members during its monitoring of Evergreen. Although Shen–Jaffe told the LSC monitors that release of the files would violate Evergreen's agreement with its union, LSC threatened to cut off Evergreen's funding if it did not release the personnel files promptly.

After his conversation with Shen–Jaffe, Savage told Michelle Ryan, Union president, that LSC might request personnel files. On April 21, 1989, Rosemarie Cordello, an attorney for the Union, notified Savage that the Union would seek to enjoin disclosure of personnel files.

LSC began monitoring MCLAS on April 24, 1989. LSC's monitoring work plan stated that MCLAS personnel files should be reviewed to "assess evaluation process of staff," and to examine staff grievances. Defendants' Exh. 109, at 705. On April 27, 1989, David de Latour, LSC "team leader," requested five personnel files, three from non-Union employees and two from Union members Kednay and Fausnaught.

MCLAS allowed LSC to review personnel files of the non-Union employees but refused to turn over the files of Fausnaught and Kednay. Savage showed de Latour a copy of Cordello's letter objecting to release of personnel files. De Latour left, apparently to consult with his superiors in Washington, D.C.

De Latour then told Savage he wanted access to all personnel files. When Savage asked what specific information de Latour wanted from the files, de Latour responded that LSC policy was to review entire files. Savage then asked to speak to Ryan, the Union president, to see whether Kednay and Fausnaught would consent to release of their files.

At Savage's request, Ryan agreed to ask the employees whether they would consent to release. Ryan gave Savage a list of items that the Union considered confidential: (1) reasons for personal leave or leave of absence; (2) medical information; (3) names of emergency contact persons; (4) financial information, e.g., credit union records; (5) salary reduction agreements; (6) grievances with names and identifiers; (7) disciplinary actions with names and identifiers; and (8) home addresses and phone numbers. Defendants' Exh. 111, at Exh. 1.

Bruce McDonald, assistant manager of LSC's Office of Monitoring, Audit, and Compliance, told Emilia DiSanto, the office director, that MCLAS was denying access to documents. DiSanto asked McDonald whether the document request was reasonable and necessary. McDonald told her that de Latour had found the request reasonable and necessary. DiSanto does not

remember determining whether de Latour could obtain the information he sought from other sources. DiSanto Deposition at 27. She told McDonald to telephone MCLAS and seek access to the documents.

McDonald telephoned Savage, demanding that MCLAS release the personnel files. McDonald told Savage that if MCLAS refused, LSC would consider MCLAS in breach of its agreement with LSC. Savage told McDonald that the information which LSC wanted was available from non-confidential sources. McDonald insisted that the issue was not information in the files but the right to see the files.

Savage then tried to compromise with de Latour. After de Latour reviewed the Union's list of confidential items, he agreed not to review medical records or emergency contact persons, but he still wanted to review personal leave requests, grievances, and disciplinary actions. Savage told de Latour the information he requested either was available from other files or was not in the personnel files at all. De Latour insisted on seeing entire personnel files. De Latour requested and received Kednay's grievance file, which was not in her personnel file.

Savage again met with Ryan. She told Savage that the employees would not consent to release.

Savage was trapped. He could either breach the CBA by releasing the personnel files, or risk losing half of MCLAS's annual budget by disobeying LSC's demands. Savage decided to release the files. On the afternoon of April 27, 1989, Savage notified the Union that he would release the files on April 28. The Union's attorneys replied that the Union would seek a temporary restraining order (TRO) in this court to block the release. The Union filed grievances on behalf of Kednay and Fausnaught, which went directly to arbitration.

At 9:10 a.m. on April 28, 1989, I granted plaintiffs' motion for a TRO. The TRO prohibited MCLAS from releasing the personnel files and prohibited LSC from suspending or terminating MCLAS funding because of this incident. At the preliminary injunction hearing on May 19, 1989, the parties agreed to maintain the status quo pending trial.

On June 27, 1989, Arbitrator Leroy R. Smith concluded that MCLAS had not yet violated the CBA, but that release of the personnel files without the employees' consent would violate the CBA. Plaintiff's Exh. 1. The arbitrator ordered MCLAS not to release the personnel files without consent. He also determined that if this court ordered MCLAS to release personnel files, release would not violate the CBA.

### III. LSC's Need to Review Personnel Files

#### A. LSC's Witnesses

De Latour now states that he needed the personnel files "to obtain an initial cross section of employment positions—the director, an administrator, a supervising attorney, a receptionist and the bookkeeper." LSC's Witness Statements at 4. He selected Kednay's file because she had filed a grievance. He selected Fausnaught's file "to assess the effectiveness of the evaluation of the attorney's supervisory functions."

De Latour states personnel files might help him determine whether the Family Law practice group discriminated against male attorneys or whether MCLAS discriminated against members of minority groups.

De Latour admits that on April 27, 1989, he did not reveal to Savage all his reasons for reviewing personnel files. He insists that even if the information LSC seeks is available elsewhere, he needs to cross-check it against the original documents.

De Latour states that he keeps information obtained from personnel files confidential. He believes that Kednay and Fausnaught would suffer no invasion of their privacy "because the information is available from other sources." LSC Witness Statements at 8.

Alice C. Dickerson, Director of the Office of Human Resources/Equal Opportunity for LSC, testifies that review of personnel files is "vital" to comprehensive compliance

reviews and to evaluating possible defenses to charges of discrimination. *Id.* at 25. Review of personnel files allows LSC to verify that the local office consistently applies policies and procedures on recruitment, hiring, compensation, promotion, training, working conditions, promotions, benefits, layoffs, discipline, and discharge. Dickerson states that the confidentiality and privacy of the personnel files is protected, although "relevant materials in personnel files may be copied for limited purposes of an investigation." *Id.*

Lluna C. McCann, an LSC monitor, states that she is an expert in reviewing the management practices of organizations. McCann is a research associate at the Bureau of Governmental Research and an adjunct instructor in a graduate program in planning, public policy, and management at the University of Oregon.

McCann states that personnel records are "a vital source of factual documentation for establishing an organization's pattern and practices relating to human resource recruitment and hiring, compensation, promotion and training, benefits programs, layoffs, discipline and grievance, forecasting and planning, health and safety, and retirement and termination." *Id.* at 10–11. Personnel files also show an organization's effectiveness.

McCann further states that indirect access to personnel files or review of redacted personnel files cannot give the LSC monitors reliable information about compliance with anti-discrimination laws, or other information LSC requires. McCann states that her review of personnel files has not caused disclosures of individual work histories. Local legal services programs welcome review by trained professionals.

DiSanto states that LSC needs personnel files to (1) assess compliance with rules on attorney hiring and outside practice of law; (2) determine whether there is discrimination against the handicapped; (3) ensure that personnel files and performance reviews are consistent, and that compensation corresponds with performance evaluations; (4) determine the number of grievances and the basis for the grievances; (5)

determine whether the program encourages experienced and qualified staff to stay; (6) identify unusual or unsubstantiated compensation; (7) assess employee leave and sick leave, and to confirm fiscal records; and (8) determine the accuracy of job descriptions.

DiSanto states that during a recent audit, a review of the administrator/comptroller showed that the local program had not evaluated her for several years. LSC later learned that the comptroller had allegedly embezzled more than $160,000 in LSC funds.

## B. Plaintiffs' Witnesses

Savage responds to the LSC's laundry list of reasons for seeking personnel files. Savage states that personnel files would reveal nothing about recruiting and hiring employees. MCLAS keeps files on each opening at MCLAS, including job advertisements and applicants' resumes.

The bookkeeper is the best source of information about employee compensation. The bookkeeper has copies of checks and tax forms to prove the actual amount of compensation. The bookkeeper also has information on benefits for particular employees, and the administrator has general information about the benefit package. The bookkeeper also would have information about any unusual financial arrangements with employees.

Regarding probationary employees, Savage states that the supervisors of each department draft memos to employees about their probationary periods. Savage states that the personnel files contain no information about training.

Savage states that if a complaint about working conditions became a grievance, it would be in the separate grievance file, which LSC reviewed. If the complaint was a "general objection about working conditions by the Union or a Union member," the complaint would be in the Union correspondence file.

Kednay was the only employee to file a grievance since LSC last audited MCLAS. Kednay, who has been MCLAS's bookkeep-

er for eight years, took a three-week vacation in April 1988. When she returned from vacation, she was forced to work overtime to correct errors in her replacement's bookkeeping. She filed the grievance because of overtime needed to correct the books. She alleged no impropriety or mismanagement. The grievance never reached a formal stage. Because MCLAS places only formal grievances in personnel files, Kednay's personnel file does not contain her grievance.

Savage states that MCLAS has not laid off any employees in the last seven years, so files would contain no information on that subject.

The personnel files contain no information about employee discipline. Savage states that if MCLAS formally disciplines an employee, that information is not kept in personnel files.

The personnel files contain no information about whether a pattern or practice of discrimination exists at MCLAS. If an employee or the Union filed a grievance alleging discrimination, information about it would be in the grievance file.

LSC's 1985 monitoring report on MCLAS stated that despite aggressive recruiting of minority applicants, only three of MCLAS's thirty-six employees were black or Hispanic. The 1985 report speculated that "private firms and other agencies are able to outbid MCLAS for minority applicants." Defendants' Exh. 108 at 8. The 1987 report found that MCLAS had hired more black and Hispanic employees. About seventeen percent of MCLAS employees were black or Hispanic, which favorably compared to the eleven percent minority population in Multnomah County.

The personnel files contain no recent employee evaluations. Until MCLAS and the Union can agree on new format for evaluations, MCLAS will not place them in personnel files.

Plaintiffs submit the witness statement of Earl A. Molander, Ph.D., chairman of the Department of Management at Portland State University, to rebut the testimony of LSC's expert McCann. Molander states that assessing an organization's performance does not require reviewing personnel files.

Molander states that McCann's testimony focuses on internal personnel management, where review of personnel files may be proper. In Molander's opinion, McCann incorrectly concludes that external assessments also require review of such files. Molander states that because the information sought from the personnel files could be obtained from other sources, review of the files is unnecessary and irrelevant. No sensible manager would use such a "dramatically intrusive" means if the information could be obtained through less offensive means.

Plaintiffs submit the statement of James Benny Jones, a lawyer who has led thirty-six field reviews for LSC. Jones specialized in urban LSC grantees such as MCLAS. Jones was asked to review personnel files but always found an alternative verification method because he was uncomfortable requesting confidential information. Jones states that just before reviewing MCLAS's program in 1985, "he was asked to co-lead the team with the West Coast Regional Officer Terry Oehler because Mr. Tony Gomes indicated that the monitoring division wanted to scrutinize Mr. Savage's program in light of his perceived liberalism." Jones states that this was the only time that LSC explicitly cited a director's politics as a reason for scrutiny, although he suspects such practices occurred on other occasions.

Plaintiffs also submit the statement of James T. Perry, who participated in forty reviews of grantees as a consultant for LSC, including twenty reviews as team captain. Perry states that he never found "anything of even remote interest in a personnel file." He also states that he found ways to review personnel files without looking at the files himself, either by reviewing other records or having the grantee's director answer questions about the files.

## IV. *Congressional Criticisms of LSC*

During the past three years, Congress has harshly criticized LSC, and has enacted

laws to force LSC to obey congressional directives. On September 17, 1986, Representative Robert Kastenmeier of Wisconsin stated that LSC's document requests before its monitoring visits "in many cases . . . can only be viewed as unreasonable, wasteful, and possibly for harassment purposes." Plaintiff's Exh. 10, at 2. Kastenmeier also reported that LSC may have released confidential information that it obtained through monitoring to the press. Although LSC apparently adopted some of Representative Kastenmeier's suggestions, on April 26, 1988, Senator Cranston stated that "the bureaucrats at the Corporation headquarters have carried out a program of harassment of local legal services programs which has had the effect of demoralizing and distracting the staffs of these fine programs from carrying out their responsibilities. . . ." 134 Cong.Rec. S4794, 100 Cong., 2d Sess. (daily ed. April 26, 1988).

Congress has shown its continuing distrust of LSC's current Board of Directors. In 1988, Congress rejected LSC's request to reduce its 1989 budget from $308 million to $250 million. In the debate over LSC's request, Senator Warren Rudman of New Hampshire stated,

I wonder, Mr. President, what would happen if a corporation brought in a board of directors, elected a new president, and the president of the corporation said publicly that his first priority would be to try to impair the efficiency, cut down on the delivery of services of that corporation? Obviously, what we had in this corporation for the last 5 years has been, essentially, a war between those in this country who believe in legal services for the poor and a board that is supposed to run that corporation, but has done more to run it into the ground than it has to run the corporation in any positive way.

134 Cong.Rec. S10016, 100 Cong., 2d Sess. (daily ed. July 27, 1988).

In 1988, Congress required that an LSC Board of Directors nominated after January 20, 1989, develop and implement competitive bidding for all legal services grants and contracts. Act of October 1, 1988, Pub.L. No. 100–459, § 605, 102 Stat. 2186, 2227 (1988). Senator Rudman explained that Congress required a new Board to implement the competitive bidding because "a majority of the current Board of Directors . . . has been intent on destroying the Legal Services Corporation using whatever tactics they have at their disposal." 134 Cong.Rec. S13355, 100 Cong., 2d Sess. (daily ed. Sept. 27, 1988).

In 1989, Congress was forced to rein in LSC because LSC had defied the Act of October 1, 1988. See Act of June 30, 1989, Pub.L. No. 101–45, 103 Stat. 97, 121–22 (1989). Senator Rudman explained that LSC had developed a competitive bidding system "in violation of the letter and spirit of Public Law 100–459," and that LSC had "a misguided view of its authority" to regulate funding from private sources. 135 Cong. Rec. S7232–33, 101 Cong., 1st Sess. (daily ed. June 22, 1989). Senator Rudman stated, "There is absolutely no trust in the present [LSC] board. . . . They have adopted regulations that hinder legal services, they have held secret meetings . . . and they have done audits [of local grant recipients] that were actually harassment." Barrett, *Under Bush, a Band of Reaganites Continues Fight to Slash Funds for Legal Aid to the Poor,* Wall St. J., Aug. 29, 1989, at A–18.

## V. *LSC's Monitoring of Other Legal Aid Programs*

LSC's demand to review personnel files here is not an isolated incident.

In March 1989, during a monitoring visit to Evergreen Legal Services in Seattle, LSC demanded the personnel files of union members, including those who did not consent to release. LSC refused Evergreen's offer to review anonymous files or those of consenting employees only. LSC monitors said that they needed the personnel files to determine whether they contained a dues checkoff for the United Way, and whether they showed any discrimination against minorities, women, or the handicapped. Evergreen eventually complied with LSC's demands.

In September 1988, LSC monitors demanded personnel files from Rhode Island Legal Services, Inc. (RILS). Citing state privacy law, RILS offered to provide the files with identifying information redacted. LSC refused. In November 1988, LSC issued a "Notice of Preliminary Determination to Suspend Funding." Defendants' Exh. 112. In December 1988, LSC agreed that RILS would submit the personnel files of consenting employees only. This compromise was identical to one offered by RILS director Kenneth F. MacIver in September 1988.

In March 1989, LSC monitors demanded personnel files from Wayne County Neighborhood Legal Services in Detroit, Michigan. When both union and management employees objected to release, LSC agreed not to review union members' files. However, LSC insisted on viewing management personnel files, and rejected any attempts at compromise. The dispute apparently remains unresolved.

## STANDARDS

To obtain a permanent injunction, the plaintiff must show irreparable injury and inadequacy of legal remedies. *Sierra Club v. Penfold*, 857 F.2d 1307, 1318 (9th Cir. 1988). The court must balance competing claims of injury and the effect on each party of granting or denying the requested relief. *Id.*

## DISCUSSION

### I. *Permanent Injunction*

#### A. Tortious Interference with Contract Claim

■ Plaintiffs contend that LSC interfered in plaintiffs' CBA with MCLAS.

To state a claim for intentional interference with a contractual relationship, the plaintiff must show that the defendant knows that interference is substantially certain to occur because of its conduct, and is a necessary consequence of that conduct. *Straube v. Larson*, 287 Or. 357, 361, 600 P.2d 371 (1979). The plaintiff need not prove that the defendant acted "for the purpose of interfering," or desired interfer-ence. *Id.* The plaintiff must show that the defendant interfered "in pursuit of an improper or wrongful motive" or used "an improper or wrongful means." *Lewis v. Oregon Beauty Supply Co.*, 302 Or. 616, 622, 733 P.2d 430 (1987).

#### 1. Intent

LSC knew that interference was substantially certain to occur because of its demand to review the personnel files, and that interference was a necessary consequence thereof. LSC knew that the CBA provision prohibited MCLAS from releasing personnel files without employee consent. LSC also knew that the Union specifically objected to release.

#### 2. Improper Motive or Means

LSC had improper motives for demanding the personnel files and used improper means. LSC contends that it was just doing its statutory and contractual duty in demanding the personnel files. LSC cites *National Clients Council, Inc. v. LSC*, 617 F.Supp. 480, 489–90 (D.D.C.1985).

In *National Clients Council*, the court upheld LSC's right to terminate funding because, among other reasons, the legal aid program had denied access to records requested by LSC monitors. There, the legal aid program had spent thousands of dollars to rent cars for staff members' personal use, and had made improper salary advances to employees. During an on-site visit, the legal aid program denied LSC access to training files, technical assistance files, and correspondence files.

I agree with LSC and the *National Clients Council* court that LSC has a "broad right of access to documents." 617 F.Supp. at 481. However, LSC's broad right is not absolute. It is limited by LSC's own regulations, which require that document requests be reasonable and necessary.

LSC has no written standards for determining when a request is reasonable and necessary. When DiSanto was asked for an example of a document request that would *not* be reasonable and necessary, she answered, "That's very difficult to say." DiSanto Deposition at 28. When

asked about the requests at issue here, DiSanto stated that "the program will provide LSC access to documents when they're requested unless they are subject to the attorney/client privilege." DiSanto Deposition at 51. LSC apparently does not evaluate the "team leader's" decision that a request is reasonable and necessary. LSC seemed to consider any document request that did not violate attorney-client privilege to be "reasonable and necessary." That interpretation renders the requirement meaningless.

LSC and its attorneys now offer elaborate, high-minded reasons to justify the request to review personnel files. Curiously, most of these compelling reasons were not contained in the work plan or expressed during monitoring.

LSC's original work plan refers to personnel files only twice, stating that they would aid in assessing staff evaluations and grievances. However, MCLAS personnel files contain neither grievances nor evaluations.

Detecting discrimination and ferreting out sloppy personnel practices are laudable goals. However, LSC has fallen far short of showing that review of personnel files is "necessary" to achieve those goals. Every piece of information LSC claims to need is available elsewhere.

I accept plaintiffs' expert Molander's statement that review of personnel records is unnecessary when the same information is available elsewhere. This is only logical if the real issue is gathering information and not forcing access on demand. I reject LSC's expert McCann's testimony.

In considering whether a document request is "reasonable," LSC must recognize that local legal service programs may have legitimate countervailing interests. LSC has ignored MCLAS's agreement with its union. For its part, MCLAS did everything it could to accommodate LSC's requests, as de Latour admits. Compromise and accommodation are not incompatible with LSC's statutory mission.

LSC's past conduct belies its assertions that its motives have been pure. The evidence that LSC has been hostile toward legal services programs is overwhelming. The dispute here has been replayed with slightly different scripts in Rhode Island, Michigan, and Washington State. I accept Jones's statement that Anthony Gomes, manager of the monitoring division, "wanted to scrutinize [MCLAS] in light of Savage's perceived liberalism." Jones Witness Statement at 2. Jones's statement is relevant and admissible. Members of Congress have repeatedly found that LSC tried to destroy the legal services programs it was supposed to foster and protect.[1]

**B. Irreparable Injury**

Plaintiffs also have shown that the release of the personnel records would cause irreparable injury. Kednay states that her personnel file contains "information which would damage her reputation." Fausnaught states that her file contains "information about medical conditions and personal reasons for taking leave which should be kept private."

LSC asks plaintiffs to rely on its assurances that the files will remain confidential. Representative Kastenmeier's letter indicates that such assurances may not be worth much.

LSC argues that money damages would be an adequate remedy even if LSC did disclose information from these files. This argument ignores the nature of the injury. Once the personnel files are released to LSC, the damage to privacy rights is done. I agree with the arbitrator that "[i]t is not possible to 'unring the bell', so to speak, and there would be no way to avoid irreparable damage to an employee" once the personnel files were released. Plaintiffs' Exh. 1 at 5. Money damages might assuage these injuries, but they cannot cure them.

LSC argues that because the information sought from the personnel files is kept in other, non-confidential files, employees would not be injured by release of their

---

1. I take judicial notice of statements in the Congressional Record. For purposes of this opinion, I do not consider the statement of Senator Rudman in the Wall Street Journal.

personnel files. LSC misses the point. Although the information LSC seeks may be in non-confidential files, the personnel files also contain other information not available elsewhere that the employees may legitimately consider private.

### C. The Validity of Section 26.6 of the CBA

■ LSC argues that injunctive relief is not appropriate because section 26.6 of the CBA is void. LSC contends that section 26.6 conflicts with LSC's legal mandate to monitor legal services programs funded by it.

If there is a conflict, it was created by LSC. LSC's legal mandate requires that document requests be reasonable and necessary. The CBA allows personnel files to be disclosed by consent or court order. These provisions are not facially contradictory.

■ LSC also argues that public policy forbids an injunction. LSC alleges that plaintiffs and MCLAS "orchestrated" this case to deny LSC access to personnel files while preserving MCLAS funding.

This argument has no merit. Savage acted ethically and responsibly by notifying the Union that he intended to release the personnel files, especially because plaintiffs' attorneys had requested such notification. As plaintiffs point out, MCLAS's "collusion" was not very helpful. MCLAS informed plaintiffs in the late afternoon of April 27 that it intended to release the files by noon the next day. Plaintiffs had to scramble to prepare briefs and affidavits by the next morning. If no judge of this court had been available before noon April 28, 1989, MCLAS would have released the files. In any event, collusion between plaintiffs and MCLAS would not make LSC's conduct proper.

Plaintiffs are entitled to injunctive relief.

### II. *The Arbitration Award*

LSC argues that I should not enforce the arbitration award. LSC repeats the argument that section 26.6 is against public policy and that this action is "a collusive attempt to deprive LSC of its rights under the contract." Trial Memorandum of LSC at 26. I have already rejected these arguments.

LSC cites *W.R. Grace & Co. v. Local 759*, 461 U.S. 757, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983). In *W.R. Grace*, the employer agreed with the Equal Employment Opportunity Commission (EEOC) that if the employer laid off employees, it would maintain the existing proportion of women in the bargaining unit. However, the employer's agreement with the EEOC conflicted with its CBA, which required that layoffs be made according to seniority.

The employer then laid off employees in accordance with the EEOC agreement. An arbitrator found the employer liable for breaching the CBA, awarding damages but not injunctive relief. The Court stated that "[c]ompensatory damages may be available to a plaintiff injured by a breach of contract even when specific performance of the contract would violate public policy." 461 U.S. at 769 n. 13, 103 S.Ct. at 2185 n. 13.

*W.R. Grace* is irrelevant because an injunction here will not violate public policy. There is no conflict with LSC's statutory mandate. I am not aware of a public policy in favor of releasing confidential personnel files. If anything, public policy is directly contrary. *See, e.g.,* ORS 192.555 (prohibiting disclosure of private financial records).

■ LSC also contends that the arbitrator exceeded his authority because the CBA does not require arbitration. LSC relies on section 30.3 of the CBA, which states that when LSC requires policy or manual changes which would derogate or detract from the rights or benefits granted to employees by the CBA, the matter should not be grieved but instead MCLAS or the Union may demand to bargain. LSC argues that the arbitrator did not consider this issue.

However, Richard Slottee, who helped to negotiate the CBA, indicates by affidavit that MCLAS and the Union did not intend section 30.3 to abrogate the grievance process regarding alleged violations of section

26.6. The arbitrator's decision is enforceable.

### III. *The Propriety of Enjoining LSC From Terminating MCLAS Funding*

LSC contends that even if I enjoin MCLAS from releasing the personnel files to LSC, I should not enjoin LSC from terminating MCLAS's funding. LSC argues that an injunction against release would sufficiently protect the Union's contract rights. I disagree. LSC has argued throughout this litigation that MCLAS is in breach of its agreement with LSC, despite my order forbidding release. An injunction is necessary to prevent LSC from irreparably harming MCLAS by terminating funding. The Union's victory on its contract claim would be hollow if LSC were allowed to terminate funding over this issue.

■ LSC also contends that this issue is not ripe because LSC must jump through several procedural hoops before it can terminate funds. The ripeness doctrine prevents courts from entangling themselves in abstract disputes of administrative policies, and protects agencies from judicial interference until the agency has made a final decision and its effects are felt by the challenging parties. *Nevada ex rel. Loux v. Herrington*, 777 F.2d 529, 534 (9th Cir. 1985). Ripeness depends on the fitness of the issues for judicial decision and on the hardship to the parties of withholding consideration. *Id.* at 535.

LSC's previous conduct in other, similar disputes shows that it considers denial of a document request grounds for termination. LSC's own guidelines require that the LSC president issue a preliminary determination of grounds for suspension of financial assistance within five days of learning that a legal aid program has denied LSC access to requested documents. This issue is ripe.

### IV. *LSC's Claim for Specific Performance*

■ I dismiss LSC's claim for specific performance. LSC contends that MCLAS breached its contract with LSC. LSC ordered MCLAS to turn over the personnel files, and the evidence shows that MCLAS fully intended to release the files. However, I issued a TRO that prevented it from doing so. If MCLAS had released the files, it would have violated my order. MCLAS did not breach its contract with LSC by complying with my court order. I also dismiss LSC's cross-claims and counterclaims for declaratory judgment.

### CONCLUSION

I grant judgment for plaintiffs. I dismiss LSC's claims. I require MCLAS to comply with the arbitration decision, and enjoin MCLAS from releasing the personnel files of Union members without their consent, unless MCLAS is required to do so by court order. I enjoin LSC from requiring MCLAS to release the personnel files of Union members, and from terminating or suspending MCLAS's funding because of MCLAS's failure to release the personnel files of Union members.