IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 7, 2001 Session

## KENNETH E. NELSON, ET AL. v. METRIC REALTY, ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 97-2189-I    Irvin H. Kilcrease, Jr., Chancellor**

---

**No. M2000-03204-COA-R3-CV - Filed September 26, 2002**

---

Plaintiffs appeal the action of the trial court in converting a T.R.C.P. Rule 12.02 motion of those referred to as "affiliated defendants" into a T.R.C.P. Rule 56 motion and then granting it,  and in sustaining a motion for summary judgment in favor of those described as "advisor defendants."  The action against all Defendants asserted tortious interference with contract.  Defendants appeal the trial court action in overruling their motion for summary judgment based upon the statute of limitations. We affirm the action of the Chancellor in granting summary judgment to the "affiliated defendants" and in granting the motion for summary judgment of the "advisor defendants."  We further hold that the statute of limitations had expired as to all defendants.  As modified, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed as Modified**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, J. and FRANK G. CLEMENT, JR., SP. J., joined.

H. Buckley Cole and Carol M. Joiner, Nashville, Tennessee, for the appellants, Kenneth E. Nelson and Nashville Lodging Co.

Garry K. Grooms, Nashville, Tennessee, for the appellees, Metric Realty, Metric Realty Corp., Metric Holdings, Inc., Metric Management, Inc., GHI Associates II, L.P., Metric Realty Services, Inc., Chris Komanowski, Joseph D. Long, Ronald E. Zuzack, Robert A. Fiddaman, and W. Patrick McDowell.

### OPINION

This case is another chapter in the continuing saga of Kenneth E. Nelson, Nashville Lodging Co., Orlando Residence, Ltd., and Metric Partners Growth Suite Investors, L.P. ("GSI").  The facts precipitating this controversy are set forth in *Orlando Residence, Ltd. v. Nashville Lodging Co.*, No. 01A01-9807-CH-00357A, slip op. at 1-3 (Tenn. Ct. App. Nov. 17, 1999) as follows:

The seeds of the present dispute were sown in 1981 when Samuel H. Hardige hired Kenneth E. Nelson to oversee one of his businesses. Mr. Hardige fired Mr. Nelson a short time later, thereby precipitating considerable litigation between Mr. Nelson and various business entities owned by Mr. Hardige. When the litigation was eventually settled, Nashville Residence Corporation ("Nashville Residence"), of which Mr. Nelson was the principal stockholder, received a tract of land at 2300 Elm Hill Pike in Nashville. In return, Nashville Residence and two sureties executed a $250,000 note to Orlando Residence, Ltd. ("Orlando Residence"), a limited partnership with Mr. Hardige as the general partner. (Footnote omitted). Thereafter Nashville Lodging Company ("Nashville Lodging"), a Tennessee-based limited partnership with Nashville Residence as its general partner, built a Marriott Hotel on the Elm Hill property.

Nashville Residence defaulted on the note to Orlando Residence. In December 1986, Orlando Residence sued Nashville Residence in the United States District Court for the Middle District of Tennessee. Shortly after Orlando Residence filed suit, Nashville Residence quitclaimed the Elm Hill property to Nashville Lodging. In 1989, Nashville Lodging sold the hotel and leased the property to Metric Partners Growth Suite Investors, L.P. ("Metric Partners"). In March 1990, Orlando Residence obtained a judgment in federal court against Nashville Residence for $250,000 plus interest.

Armed with its $250,000 judgment, Orlando Residence filed suit in the Chancery Court for Davidson County against Nashville Residence, Nashville Lodging, Mr. Nelson, and Metric Partners attacking the conveyance of the Elm Hill property as a fraudulent conveyance. Orlando Residence eventually succeeded with its claim and was awarded $501,934 in compensatory and $850,000 in punitive damages from Nashville Residence and Nashville Lodging. Both Nashville Residence and Nashville Lodging appealed to this court.

Orlando Residence decided to execute on its chancery court judgment while Nashville Residence's and Nashville Lodging's appeal was pending. In the summer of 1996, Orlando Residence moved to subject the Elm Hill property to an execution sale. Orlando Residence purchased the property for $100,000, and this sale was confirmed by the trial court. Three months later, this court reversed Orlando Residence's judgment and remanded the case for a new trial. *See Orlando Residence Ltd. v. Nashville Lodging Co.*, No. 01A01-9606-CH-00256, 1996 WL 724915, at *4-7 (Tenn. Ct. App. Dec. 18, 1996), *perm. app. denied concurring in results only* (Tenn. May 19, 1997).

With the fraudulent conveyance judgment now vacated, Nashville Lodging and Nashville Residence, not surprisingly, requested the trial court to set aside the execution sale of the Elm Hill property to Orlando Residence. They also requested

the trial court to dismiss the case because Orlando Residence lacked standing to enforce the federal court judgment. The trial court declined to dismiss Orlando Residence's fraudulent transfer suit or to set aside the judicial sale. After several additional skirmishes, Nashville Residence and Nashville Lodging again appealed to this court.

Nashville Lodging also decided to try another legal tack after the trial court denied its motion to set aside the judicial sale. It filed a new action in the Chancery Court for Davidson County claiming that Orlando Residence was being unjustly enriched as a result of its purchase of the Elm Hill property at the judicial sale. This case was assigned to the trial court where Orlando Residence's fraudulent conveyance claim was pending. Accordingly, Nashville Lodging asserted that it was entitled to return of the property and to restitution of all rents and profits received by Orlando Residence after the execution sale. (Footnote omitted). Orlando Residence swiftly moved to dismiss this lawsuit on res judicata grounds. On September 8, 1998, the trial court dismissed Nashville Lodging's complaint. Nashville Lodging Company perfected its second appeal to this court.

The dispute over the Elm Hill property took on a new dimension prior to the oral arguments in both appeals. Metric Partners defaulted on a promissory note it had signed as part of the 1989 conveyance of the property and purchase of the hotel. (Footnote omitted). The note was secured by a first mortgage on both the Elm Hill property and the hotel. Following the default, the holder of the note notified the parties that it intended to foreclose on and sell the Elm Hill property and the hotel. The foreclosure sale was conducted shortly after this court heard oral argument in the appeal involving Orlando Residence's fraudulent conveyance claim. WBL II Real Estate Limited Partnership purchased the Elm Hill property and the hotel for $9,050,000. The trustee of the deed of trust estimated that approximately $500,000 in excess proceeds would be distributed to the owner of the Elm Hill property after the existing indebtedness was satisfied.

The foreclosure sale ended any possibility that either Orlando Residence, Nashville Lodging, or Nashville Residence could recover possession of the Elm Hill property. Accordingly, following oral argument in its appeal from the trial court's dismissal of its unjust enrichment complaint against Orlando Residence, Nashville Lodging moved to dismiss its appeal from the dismissal of its unjust enrichment claim.

*Orlando Residence, Ltd. v. Nashville Lodging Co.,* No. 01A01-9807-CH-00357A, slip op. at 1-3 (Tenn. Ct. App. Nov. 17, 1999).

On the second trial of the fraudulent conveyance action on August 21st through August 25th, 2000, the jury again found the conveyance from Nashville Residence to Nashville Lodging in 1986 to have been fraudulent and on appeal, this Court affirmed the judgment holding:

> The evidence in the record shows that estimates of the equity in the hotel at the time of the transfer to Nashville Lodging ran from $517,000 to $4.5 million. Nashville Residence did not receive any consideration for the transfer, and after the transfer, Nashville Residence had no other assets with which to pay the $250,000 judgment held by Orlando Residence. We think the jury easily could have found evidence to satisfy the requirements of Tenn. Code Ann. § 66-3-305.

> The evidence also showed that just five days after Orlando Residence received its judgment defendant Nelson began to transfer assets out of Nashville Residence to a newly-formed limited partnership composed of the same individuals involved in Nashville Residence. The transfers were accomplished in secret and were marked with numerous other badges of fraud. *See* William H. Inman, *Gibson's Suits in Chancery*, § 447 (7th ed. 1988). We are satisfied that the jury properly assessed the evidence that satisfies Tenn. Code Ann. § 66-3-101.

*Orlando Residence, Ltd.*, No. M2001-00648-COA-R3-CV-filed May 21, 2002 (Tenn. Ct. App. May 21, 2002).

The foregoing factual background, relative to the Nashville property, is essential to a proper understanding of the parallel litigation in California upon which the case at bar is predicated.

The disputes between Nelson and GSI began in the late 1980's when GSI acquired certain Residence Inn hotels from entities controlled by Nelson. GSI acquired both the Residence Inn in Nashville, Tennessee and the Residence Inn in Ontario, California. For a time, Nelson continued to provide management services at these Residence Inn hotels, including the Ontario hotel in California, which was managed by Nelson from April 1988 to February 1991. GSI believed that Nelson breached his management agreement for the Ontario hotel. GSI gave notice of termination of the agreement and filed suit in the superior court of California in and for the city and county of San Francisco in January 1991, seeking damages and declaratory and injunctive relief against Nelson. A counter-claim was filed by Nelson seeking damages and declaratory relief. James Reuben, a California attorney, represented GSI in this action. The case at bar is an attempt to hold subordinate entities and individual agents and employees of GSI personally responsible for the actions of GSI in refusing to honor a settlement agreement reached between GSI and Nelson in the California litigation. The basis for individual liability is asserted to be intentional interference with contract.

As the California case approached its trial date, two of the defendants in the case at bar, Joseph D. Long and Chris Komanowski, wrote a memo to the Investment Advisory Committee of GSI, advising:

LITIGATION STATUS

After over two years of pre-trial litigation, the nelson case is set for trial this week. although there are various elements to this case, a summary of the salient points of the litigation has been outlined below:

-    GSI is suing Nelson for conversion as he took $194,000 for purported liquidated damages when his management agreement was terminated.

-    Nelson has filed a cross complaint alleging that under his convoluted interpretation of the Purchase and Sale Agreement, he is owed approximately $775,000 or all of his guaranty back.

It is believed that GSI's case is very strong and it will prevail in court. A complete victory would entail judgment against all of the Nelson entities and Ken Nelson personally for the $194,000 plus all legal fees and expenses which, after trial, will total approximately $250,000.

Nelson currently has $2.5 million in judgments against him personally, including a $1.5 million judgment by the RTC. He has indicated that he is prepared to file personal bankruptcy if we prevail and vigorously pursue collection. Given what has been learned about Nelson during the case, this would seem like a logical move for him. If that occurred, we would stand in line as an unsecured creditor and hope to someday collect something on the judgment. There is no way of determining if and when we could collect. The judgments were entered against Nelson in December 1991. We were just informed of them last week. Why Nelson did not tell us sooner is a mystery as the mere existence of these judgments would give GSI greater motivation to settle. The only explanation is that Nelson acts irrationally. While we always knew that collection would be difficult, this information further inhibits collection prospects upon obtaining a favorable judgment.

SETTLEMENT PROPOSAL

Various settlement proposals have been discussed over the past year with the end result that Nelson is unwilling (and by his account, unable) to pay any money currently in order to settle this litigation. It is believed that all possible structures have been explored. However, the only asset which Nelson has which appears to have any value is his land lease on GSI's Nashville Residence Inn. We had explored the possibility of offsets against a settlement amount with monies paid to him under the lease but Nelson was not able to execute such a proposal due to partnership disputes in that entity. Nelson believes, however, that he can obtain approval to sell the land for $1.7 million and provide 100% financing at less than 6%, a substantial discount from the current and projected future Option Price and it is this that forms

-5-

the basis of the settlement proposal. Below I will outline the terms of the current lease and the proposed changes. The attached analysis provides an assessment of the financial impact of this proposal.

## Lease Terms

|  | Current | Proposed |
| --- | --- | --- |
| Comparable Cash Payments (over 5 years) | $119,000/yr. | $100,000/yr. |
| Deferred Rent Payments (5 years) plus interest | $371,890 | $0 |
| Extension Option | Floating rates x then current option price ($3.6M) less $100,000 for five (5) year terms | Same floating rate x $1.7M for 5 years |
| Extension Payment (today's rates) | $131,000 | $112,000 |
| Option Price (in 1998) | $3.6 million | $1.7 million |

The ground lease option price bears no resemblance to the land value itself (in reality it is a second mortgage with a kicker and was structured as a ground lease solely for Nelson's tax benefit) and thus the escalating feature will likely exceed NOI growth, thereby minimizing the prospects for a buyout and refinance in 1998. Additionally, the lease goes to great pain to spell out emphatically that Nelson has the unfettered right to approve or reject an assignment of the lease, on sale or at any other time. This was due to the fact that, as stated above, the deal was in practical terms a second mortgage rather than a traditional ground lease. Thus, Nelson would likely inhibit any sale subject to the ground lease, thereby forcing a buyout.

It is believed that under the current lease structure, it will be difficult to buy out the land and/or refinance the existing first mortgage due largely to the fact that this property was 85% leveraged at the time of acquisition in 1989. In addition, the land lease option price escalator makes a land buyout seemingly unattainable in today's marketplace. This proposed transaction substantially improves the prospects for the successful outcome of the Nashville investment.

LITIGATE vs. SETTLEMENT ANALYSIS

Below is an outline of the range of likely outcomes under either scenario (litigate or settlement):

Litigate

1.     Successful judgment for approximately $450,000 which gets fully collected.
2.     Successful judgment for approximately $450,000 which gets mired in a Nelson bankruptcy and little, if any, gets collected and GSI spends dollars in collection efforts.

3.     Successful judgment for less than full amount with outcomes #1 or #2 applying.

4.     Nelson prevails in cross complaint and GSI has a substantial ($775,000) liability.

5.     In all of the above, additional litigation costs are approximately $40,000.

Settlement

1.     Nashville property performs exceptionally well so that a refinance of the now current lease option price would be achievable.  GSI has windfall of $1.9 million, the difference between the current 1998 option price and the negotiated amount.

2.     Nashville performance is less than what would be necessary to refinance and buy out the land in 1998 under the current lease terms but the proposed structure enables a deal to take place versus potentially losing the property.

3.     Nashville's performance goes down from today's income levels by 1998 and GSI ultimately cannot refinance even the first mortgage, let alone buy out the land and loses the property.  This would mean the settlement was ultimately unfavorable to GSI.

In addition to the above analysis, it is important to note that the extinguishing of the current lease has many advantages on its own. This lease is extremely complicated, is tied to the first mortgage and contains provisions which are substantially ambiguous and leading to the specific performance language relative to the Option Price buyout which could be construed as meaning that Nelson can force GSI to purchase the land at a specified (and inflated) price.  Although I am certain that this

was not the intent, Nelson's track record would indicate that this sort of ambiguity is an invitation for further litigation.

CONCLUSION AND RECOMMENDATION

Due to the complicated nature of the Ontario litigation, Nelson's poor financial condition, and the difficulty envisioned in collection if GSI prevails, it is believed that a negotiated settlement is a prudent approach. Because we are already engaged with Nelson in the Nashville property, approaching a settlement with that in mind is most sensible both in terms of ultimate collection, as well as for the purpose of minimizing further business dealings with him. It is believed that substantial value is being created in Nashville, possibly far in excess of the scope of the current litigation, if the economy grows even at modest rates. Thus, it is recommended that the above described settlement proposal is approved and that litigation is postponed, pending the successful documentation of this agreement. If documentation cannot, for any reason, be achieved, it is recommended that GSI continue to pursue Nelson through litigation.

Substantially accepting the Long-Komanowski Memorandum of March 23, 1993, GSI and Kenneth Nelson entered into an open court settlement agreement before Honorable William J. Cahill, Judge of the San Francisco Superior Court on March 23, 1993. As a part of this in-court agreement, GSI agreed that the purchase of the land under the Nashville Marriott Residence Inn would be "as is."

The jolt to GSI came two weeks after the in-court settlement had been agreed to when Nashville Attorney Alan T. Fister addressed the following communication to Ms. Joyce S. Jaber, Vice President and Corporate Counsel of Metric Realty in San Mateo, California:

Dear Joyce:

At your request and the request of James A. Reuben, I have reviewed a Memorandum prepared by Mr. Reuben dated March 25, 1993, concerning an outline of major points of the settlement of a case involving Ken Nelson, pending in the San Francisco Superior Court, before the Honorable William J. Cahill. The core provision of this settlement appears to be a conveyance of the fee of the Nashville Residence Inn from Nashville Lodging Company to Metric Partners. Naturally, upon the conveyance of the fee, the current long-term ground lease would be merged into Metric Partners' title.

This contemplated conveyance to Metric Partners (hereinafter referred to as the "1993 Conveyance") is fraught with significant risk to Metric Partners, and I would recommend against this transaction. As you know, there is currently a fraudulent conveyance action pending in the Chancery Court for Davidson County,

-8-

wherein Plaintiff (hereinafter referred to "Hardage") alleges that there are two fraudulent conveyances in the chain of title to the Nashville Residence Inn. Specifically, the first alleged fraudulent conveyance is a [sic] unrecorded quitclaim deed dated December 22, 1986, whereby title to the Inn was transferred from 300 Elm Hill Pike, Inc. (formerly Nashville Residence Corporation) to Nashville Lodging Company, a Wisconsin Limited Partnership. Both of these entities are Nelson-controlled entities. Hardage also alleges that the conveyances to Metric Partners in May 1989 are fraudulent conveyances.

We have filed a Motion for Summary Judgment, which we believe will absolve Metric Partners of any liability in the action pending in Davidson County, Tennessee. The essence of our Motion for Summary Judgment is that the May 1989 Conveyance to Metric Partners cannot as a matter of law be deemed "fraudulent." However, while Metric Partners may be absolved of liability, the fate of the Co-Defendants is uncertain.

It is our position that given the current circumstances, as long as we can prove the 1989 Conveyance was not "fraudulent," we will not be adversely affected even if the Court were to find that the 1986 Conveyance among the Nelson entities was "fraudulent." Our argument is that even if the 1986 Conveyance is rescinded, the only impact this would have upon Metric Partners is to substitute one Nelson entity for another as "Landlord." Thus, all of our rights and remedies pursuant to the ground lease would still be in full force and effect, and we would only be paying rent to a different entity. Even if Hardage ultimately foreclosed, we believe our lease would still be valid, and we would pay rent to Hardage.

Our position is greatly buttressed by the fact that we are a "bona fide purchaser" without knowledge of the obligations between the Nelson and Hardage entities at the time of the 1989 Conveyance. Furthermore, our Affidavits clearly indicate that we had no suspicion of any fraudulent intent on the part of Nelson when we acquired title in 1989, and that we were not acting in concert with Nelson to hinder, delay or defraud his creditors.

If the 1993 Conveyance occurs, then we certainly cannot raise the argument regarding said conveyance that we were a "bona fide purchaser" without notice of the disputes between Nelson and Hardage. Furthermore, I am almost certain the Plaintiff would argue that we were now conspiring with Nelson in order to delay, defraud and hinder the creditors of Mr. Nelson and his entities. If the Judge finds that the 1986 deed was a fraudulent conveyance, then he could also find the 1993 Conveyance to be "fraudulent." If so, we would loose [sic] title to the premises. Furthermore, because our lease would have been merged into the 1993 deed, we would lose the benefit of the long-term ground lease.

In sum, without the 1993 Conveyance, we believe a "worst case" scenario would merely substitute one Landlord for another concerning the long-term ground lease. On the other hand, the worst case scenario with the 1993 Conveyance could result in Metric Partners losing both the fee and the ground lease. Furthermore, I seriously doubt that you could get title insurance to cover the 1993 Conveyance.

If you have any questions concerning these matters, please do not hesitate to contact me.

Thus, caught between a rock and a hard place, Long, Komanowski, and the other defendants at bar, who had unanimously recommended that GSI accept the California settlement, reversed course upon consideration of the Fister Memorandum and advised GSI, not to consummate the settlement.

Lest there be confusion concerning the nine separate cases pending or resolved in various jurisdictions throughout the country, between and among Nelson, GSI, and Orlando Residence, Ltd., it is well to observe that the issues in this case are very limited. This is a suit by Kenneth Nelson against individual officers and corporate advisors working for GSI or entities which were general partners at GSI. It is an attempt to hold these individuals and subordinate entities liable for the breach of the California settlement agreement by GSI. It has nothing to do with the liability of GSI itself to Nelson for the breach of the California settlement agreement. In this case, Nelson must stand or fall on his ability to prove tortious interference by these corporate agents or employees of the corporate entity GSI in the face of the their claim of privilege.

## IDENTITY AND STATUS OF THE DEFENDANTS

Metric Partners Growth Suite Investors, L.P. (referred to in the complaint as Metric Partners; referred to by the defendants as "GSI", and referred to by the plaintiffs in response to interrogatories as "Metric") is not a party to this action since it is a California Limited Partnership which is asserted by Plaintiffs to be the breaching party.

Defendant, Metric Realty, is an Illinois general partnership with principle offices in San Francisco, California and is the general partner of Metric Partners Growth Suite Investors, L.P. It is also general partner of Defendant, GHI Associates II, L.P.

Defendant, Metric Realty Corporation, is a Delaware corporation with principle offices in California and served as managing general partner of Metric Realty.

Defendant, Metric Holdings, Inc., is a Delaware corporation with principle offices in California and is a general partner of Metric Realty.

Defendant, Metric Realty Services, Inc., is a Delaware corporation with principle offices in California and in 1993 provided management services to Metric Partners Growth Suite Investors, L.P.

Defendant, Metric Management, Inc., is a Delaware corporation with principle offices in California and in 1993 provided management services to Metric Partners Growth Suite Investors, L.P.

All of these defendants are referred to as the "affiliated defendants" in the complaint and are all partnerships or corporations which were directly or indirectly general partners at Metric Partners Growth Suite Investors, L.P. The defendant, Metric Management, Inc., is a Delaware corporation which had no function with respect to the California property or the Nashville property but was an affiliate of Metric Partners Growth Suite Investors, L.P. and was the employer of the individual defendants, Long, Komanowski, and Zuzack.

The five individual defendants, Chris Komanowski, Joseph D. Long, Ronald E. Zuzack, Robert A. Fiddaman, and W. Patrick McDowell are referred to as "advisor defendants" and were agents or employees of one or more of the "affiliated defendants."

In his final order, the Chancellor held:

Plaintiffs in this case allege that Defendants are liable in tort for allegedly interfering with, and conspiring to interfere with, a contract between Plaintiffs and Metric Partners Growth Suite Investors, L.P. ('GSI').

Based upon the pleadings, affidavits, briefs, argument of counsel, and the entire record in this cause, the court finds as follows:

1. Although the parties disagree as to the applicable choice of law, the court finds that no significant differences exist between the law of Tennessee and California concerning the matters relevant to the pending motions, and that the court need [not] resolve this dispute to decide the pending motions.

2. The Court finds that no genuine issues of material fact are in dispute and that the facts establish that the defendants were each employed by or acted on behalf of Metric Realty, the general partner of GSI, the contracting party. The defendants were not strangers to the contract, and did not act in such a way as to be treated as strangers to the contract. Accordingly, Plaintiffs claim that the defendants tortiously interfered with or conspired to interfere with the contract between Plaintiffs and GSI must be dismissed.

It is accordingly ordered, adjudged and decreed that the motion of the defendants, Metric Management, Inc., Chris Komanowski, Joseph D. Long, Ronald E. Zuzack, Robert A. Fiddaman, and W. Patrick McDowell is granted.

. . . .

The Court having previously dismissed the claims against the remaining defendants, this action is dismissed in its entirety. Court costs shall be taxed to the plaintiffs, for which execution may issue, if necessary.

Appellate court review of summary judgment involves purely a question of law and no presumption of correctness attaches to the trial court's judgment. *Carvell v. Bottoms*, 900 S.W.2d 23 (Tenn. 1995). In reviewing summary judgment, all facts and inferences to be drawn from such facts must be construed in favor of the non-moving party and summary judgment may be granted only when there is no disputed material fact creating a genuine issue for trial. *Byrd v. Hall*, 847 S.W.2d 208 (Tenn. 1993).

The Chancellor correctly sustained the defendants' motions for summary judgment in this case. Given the contents of the Fister Memorandum, the total lack of proof offered by the plaintiffs of personal motivation or use of wrongful means by the defendants in causing the breach by GSI of the settlement agreement, and the controlling law pronounced by *Forrester v. Stockstill*, 869 S.W.2d 328 (Tenn. 1994); *Waste Conversion Systems, Inc. v. Greenstone Industries, Inc.*, 33 S.W.3d 779 (Tenn. 2000), and *Trau-Med of America, Inc. v. Allstate Insurance Company*, No. W1999-1524-SC-R11-CV, 2002 WL 451826 (Tenn. Mar. 25, 2002), there is no issue for trial.

Plaintiffs assert that privilege of a corporate agent or employee against an interference of contract claim is an affirmative defense. We disagree. We see no difference between the burden of proof requirements in this case and the burden of proof requirements in *Waste Conversion Systems, Inc. v. Greenstone Industries, Inc.*, 33 S.W.3d 779 (Tenn. 2000). That case involved interference by the parent corporation with the contracts of a wholly owned subsidiary. On principle, there is no distinction between *Waste Conversion Systems, Inc.* and the case at bar. Said the supreme court:

> In the case before us, the plaintiff, WCS, is the party attempting to recover from a parent corporation that was not a participant in the contract. The plaintiff is the party affirming the facts regarding the parent's interference with the contract as well as its unlawfulness in doing so. Therefore, once it is established that the subsidiary is wholly-owned by the defendant parent corporation (either as conceded in the plaintiff's complaint or as demonstrated by the defendant), the plaintiff should bear the burden of proof to show that the parent acted detrimentally to the subsidiary's economic interests. This fact should be demonstrated by the plaintiff in addition to the elements of the cause of action. The majority of our sister jurisdictions also place the burden on plaintiffs in this situation. *See, e.g., Advent Sys. Ltd. v. Unisys Corp.*, 925 F.2d 670, 673 (3d Cir. 1991) (applying Pennsylvania law); *Phil Crowley Steel Corp.*, 782 F.2d at 783; *American Med. Int'l*, 821 S.W.2d at 337; *Holloway v. Skinner*, 898 S.W.2d 793, 796 (Tex. 1995). *But see Bendix Corp.*, 610 P.2d at 29 (Alaska 1980).

*WCS v. GSI*, 33 S.W.3d 779, 783 (Tenn. 2000).

Even with the burden of proof resting on the non-moving party on summary judgment, the moving party still must satisfy his burdens under T.R.C.P. 56.

> Where the moving party adopts this second option and seeks summary judgment on the ground that the nonmoving party - - who will bear the burden of persuasion at trial - - has no evidence, the mechanics of discharging Rule 56's burden of production are somewhat trickier. Plainly, a conclusory assertion that the nonmoving party has no evidence is insufficient. See Ante, at 328, 91 L Ed 2d, at 277 (White, J., concurring). Such a 'burden' of production is no burden at all and would simply permit summary judgment procedure to be converted into a tool for harassment. See Louis 750-751. Rather, as the Court confirms, a party who moves for summary judgment on the ground that the nonmoving party has no evidence must affirmatively show the absence of evidence in the record. Ante, at 323, 91 L Ed 2d, at 273. This may require the moving party to depose the nonmoving party's witnesses or to establish the inadequacy of documentary evidence. If there is literally no evidence in the record, the moving party may demonstrate this by reviewing for the court the admissions, interrogatories, and other exchanges between the parties that are in the record. Either way, however, the moving party must affirmatively demonstrate that there is no evidence in the record to support a judgment for the nonmoving party.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 91 L.Ed.2d 265, 106 S.Ct. 2548.[1]

In meeting their burden under Rule 56, the defendants filed Plaintiffs' responses to its first set of interrogatories. In its first response, Plaintiffs answered:

> METRIC[2], at all relevant times, was controlled, directly or indirectly, by Defendants, or some of them; METRIC could not act except at the direction of such persons. Thus, the relevant acts of METRIC were caused, induced, and procured by Defendants.
> The Defendants caused METRIC to enter into the Settlement Agreement with Nashville Lodging Co., Kenneth Nelson, and others, referred to in Defendants' definitions as the SETTLEMENT AGREEMENT. Shortly after entering into the agreement, the Defendants were advised by their Nashville counsel, Alan Fister, that the effect of the contemplated transaction (purchase of the land "as is") would place

---

[1] This observation by Justice Brennan in dissent is totally consistent with the majority opinion written by Chief Justice Renquist. Justice Brennan's dissent was based on the decision to remand to the court of appeals rather than back to the district court for trial. Tennessee embraced this reasoning in *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993).

[2] Metric Partners Growth Suite Investors, L.P. is referred to as "GSI" by the defendants but is referred to as "Metric" by the plaintiffs.

METRIC's entire investment in the Nashville Residence Inn "at risk" in that it would be subject to the Hardage liens. *See*, Letter dated April 7, 1995 from A. Fister to J. Jabor. The Defendants realized this was a disastrous result for METRIC because METRIC would have to resolve the Hardage liens to protect its property. METRIC claims that it never would have entered into the agreement had it fully understood the information provided by Fister.

METRIC has now sued its counsel, James Reuben, alleging that Reuben failed to fully explain the implications of the Settlement Agreement, but all of the Defendants are responsible for this purported mistake because they approved the settlement on behalf of METRIC or participated in efforts to avoid the transaction that METRIC had agreed to perform. There is no reason that Fister's opinion could not have been obtained before METRIC entered into the agreement. Shortly after entering into the agreement, the Defendants realized they had made a terrible mistake in their management of METRIC.

Once Defendants fully understood the implications of the settlement, rather than causing METRIC to perform the agreement (and taking responsibility for their own negligence and mismanagement), the Defendants instead caused METRIC to refuse to perform its obligations under the SETTLEMENT AGREEMENT. As found by the Court in the BREACH ACTION, METRIC breached the agreement by refusing to attend to documentation of the settlement, by refusing to purchase the land, and by refusing to release Nelson. Defendants also caused METRIC to breach its duty of good faith and fair dealing, by repudiating the SETTLEMENT AGREEMENT, and by failing to perform its implied obligation to protect NLC from claims asserted by Orlando Residence, Ltd. Numerous breaches of the Settlement Agreement have been identified in the papers filed in the BREACH ACTION. Each and every beach cannot be separately identified because breaches by METRIC are continuous and ongoing; however, plaintiffs do not believe that METRIC performed any obligation of METRIC under the SETTLEMENT AGREEMENT. METRIC continues to breach in ways that include, without limitation, breaching the duty of good faith and fair dealing as shown by METRIC's "mending of the hold," by METRIC'S, and Defendants', continued denial of the existence of a binding settlement agreement, as shown even in Defendants' definition of SETTLEMENT AGREEMENT, and by METRIC's continued failure to release Kenneth E. Nelson.

Rather than take responsibility for their mistakes and mismanagement, Defendants caused METRIC to breach the agreement, to litigate with Nelson and NLC in various forums and to try and avoid the agreement. By pursuing this course, Defendants caused great expense and damages to Plaintiffs. This was designed to protect the interests of Defendants rather than the best interests of METRIC.

Accepting as true such a response, Metric might be justified in firing all of the defendants for being incompetent but it provides no proof at all that the defendants were acting wrongfully, by wrongful means, or outside the scope of their employment with Metric in avoiding a disastrous result for Metric caused by their own negligence.

Defendants further support their motion for summary judgment by the following testimony of Mr. Nelson, near the end of a 277 page deposition:

Q.      When I say - - let me - - let me explain it and then you can answer the question.  When I say that an individual acts within the scope of his employment, I mean that the individual is taking action that is consistent with the general scope of his duties as an employee of the corporation, whatever might motivate those actions.
        Do you have any belief or any facts to suggest that any of the individual defendants in this case were acting outside the scope of their general responsibilities as employees of Metric or its affiliates?
A.      Metric meaning Metric Partners Growth Suite Investors - -
Q.      Yes.
A.      - - or its affiliates?
Q.      Or its affiliates.
        MR. FELKER: Object to the question.  It's compound and complex.
Go ahead.
A.      Yes.
Q.      What facts do you have to suggest that?
A.      Well, I don't think it's in the scope of anybody's employment to act contrary to the interests of the employer or parties to whom the employer has a fiduciary duty.  When you're acting to protect yourself against the consequences of your mistake, I don't think that's in the scope of your employment.  I don't - - I don't know if you're a partner or associate or whatever, but I don't think you have the right to, you know, act counter to Farris-Warfield.  I don't think that's in the scope of your employment.

Again, Mr. Nelson presents no facts whatever, but rather his own opinion as to what was in the best interest of Metric.

The litigation in California and the litigation in Tennessee were running essentially parallel courses.  It is obvious that the left hand of GSI in San Francisco did not know what the right hand of GSI was doing in Nashville and vice versa.  The left hand of GSI in California, acting in accordance with the Long-Komanowski Memorandum of March 23, 1993 settled, in open court, the San Francisco litigation with Kenneth Nelson.  On April 7, 1993, the right hand of GSI in Nashville, delivered to the left hand in California, the Fister Memorandum, pointing out the disastrous consequences to GSI that would result in Nashville by consummation of the California settlement agreement.  Armed with the Fister Memorandum, albeit it too late to un-ring the bell of the California March 23, 1993 settlement, these defendants, acting for GSI, chose the lesser of two evils and on their collective recommendations, GSI breached the California settlement agreement and opened the door for a breach of contract action by Nelson.  Indeed, Nelson exercised his right of action against GSI for breach of the California settlement agreement by filing a third party complaint against GSI in *Orlando Residence, Ltd. v. 2300 Elm Hill Pike, Inc., Nashville Lodging Co., and William Rosenburg, Trustee,* Dav. Chancery No. 94-1911-1.  On February 9, 1996, Chancellor Irvin

Kilcrease granted summary judgment to Nelson on the third party complaint and determined, as a matter of law, that GSI had breached the California settlement agreement by failing to purchase the land. Damage issues were left to be tried in the future.

The record shows that GSI sued its counsel in California for legal malpractice in negotiating and agreeing to the California settlement. If the corporate structure of GSI determined by corporate internal means or by litigation, to have the defendants at bar answer to GSI for negligence or lack of diligence, so be it. Kenneth Nelson, however, is a stranger to GSI and these defendants, acting within the scope of their employment with GSI, are protected by privilege from the Nelson action unless Nelson can affirmatively bring them within an exception to the privilege rule.

In the context of an action by an at-will corporate employee against corporate officers for intentional interference with employment, the Tennessee Supreme Court observed:

> A corporation can act only upon the advice of its officers and agents, and its officers and directors have a duty to serve the corporation. Important societal interests are served by corporations having the clear and candid advice of their officers and agents. Fear of personal liability would tend to limit such advice. Consequently, when an officer, director, or employee of a corporation acts within the general range of his authority, and his actions are substantially motivated by an intent to further the interest of the corporation, in claims of intentional interference with employment, the action of the officer, director, or employee is considered to be the action of the corporation and is entitled to the same immunity from liability.

*Forrester v. Stockstill*, 869 S.W.2d 328, 334-35 (Tenn. 1994).

*Forrester v. Stockstill* quoted with approval *Feaheny v. Caldwell*, 175 Mich. App. 291, 437 N.W.2d 358 (1989) wherein the Michigan court observed:

> The obstacle that plaintiff faced was to establish wrongful interference on the part of the five defendants. As noted above, this required proof that each defendant did *per se* wrongful acts or did lawful acts with malice and without justification. Also required was proof, with specificity, of affirmative acts by the defendants which corroborated the unlawful purpose of the interference. Further, since all five defendants were corporate officers, plaintiff faced the very difficult obstacle of showing that each defendant stood as a third party to the employment contract at the time he allegedly performed the acts. This is so, because, as corporate officers, the defendants served as agents whose acts were privileged when acting for and on behalf of the corporation, rather than acting to further strictly personal motives.

-16-

*Forrester*, 869 S.W.2d 328, 335 (Tenn. 1994).

While *Forrester v. Stockstill* dealt with at-will employment, the principles laid out therein are general in contract interference cases as was observed by the court in quoting from an annotation in 72 ALR 4th, 492 (1989):

> Some courts have recognized that generally a corporate director, officer, or employee is not liable for tortiously interfering with a corporate contract, because he is considered a party to the contract, as long as he is acting to serve the corporate interests, or unless his activity involves individual separate tortious acts. Courts have also recognized, however, that a corporate director, officer, or employee may be liable for tortiously interfering with a corporate contract if he is acting outside the scope of his authority, acting with malice, or acting to serve his own interests.
> *Id.* at 501 (references to sections omitted).

*Forrester*, 869 S.W.2d 328, 333 (Tenn. 1994).

Plaintiffs at bar have produced no evidence that any of the defendants, whether their actions be competent or incompetent, were acting outside the scope of their authority as corporate officers and advisors of GSI, acting with malice, or acting to serve their own interests.

The Supreme Court of Tennessee, in *Wayne Conversion Systems, Inc. v. Greenstone Industries, Inc.*, 33 S.W.3d 779 (Tenn. 2000), in the context of a parent corporation interfering with a wholly owned subsidiary corporation contract elaborated on its holding in *Forrester v. Stockstill*. Said the court:

> [W]e adopted principles analogous to the notion that a corporate parent usually has a unity of interest with its wholly-owned subsidiary. *Id*. at 334-35. In that case, we stated that the wrongful interference with the at-will employment by a third person is actionable only if that person stood as a third party to the employment relationship at the time. *Id*. at 331. Since a corporation can act only upon the advice of its officers and agents and since important societal interests are served by corporations receiving candid advice from these persons, we held that officers, directors, and employees were immune from claims of intentional interference with employment if they act within the general range of their authority and their actions were substantially motivated by an intent to further the interest of the corporation. *Id.* at 334-35. The case, in the end, was decided in favor of the officers because there was insufficient proof that the officers were not acting in furtherance of the corporation's interest. *Id*. 15 335; *see also Schlater v. Haynie*, 833 S.W.2d 919, 927 (Tenn. Ct. App. 1991). *Forrester* indicates that Tennessee has recognized a privilege against an interference of contract claim when there is unity of interest between the

interfering party and the breaching party. Forrester also shows that the claim can be alleged successfully only when the interfering party is a third party not closely tied to the operations of the breaching corporation.

*WCS v. GSI*, 33 S.W.3d 779, 782 (Tenn. 2000).

*WCS v. GSI* further held, in the analogous case of parent-wholly owned subsidiary, that the privilege could be lost by the parent if the parent used "wrongful means" in interference with its wholly owned subsidiaries contractual relations.   Said the court:

> In defining the meaning of 'wrongful means,' the court in *Paglin* stated as follows:
>
>> In the context of interference with contractual relations, 'wrongful means' is defined to include acts which are wrongful in and of themselves, such as 'misrepresentations of facts, threats, violence, defamation, trespass, restraint of trade, or any other wrongful act recognized by statute or common law.'
>
> 834 F.Supp. at 1196.  The Second Circuit in *Boulevard Associates* also characterized the term in a narrow manner to include 'fraud, misrepresentation, intimidation or molestation.'   72 F.3d at 1037.  We find the holdings of both of these cases persuasive and believe that a broad definition encompassing both rules should apply in Tennessee.  We also believe that the burden of pleading and proving that the defendant parent corporation acted with wrongful means in causing its wholly-owned subsidiary to breach a contract should be on the plaintiff, once it is established that the defendant corporation owns 100 percent of the stock of the subsidiary in question. Such a holding accords with the Tennessee principles discussed above regarding the burden of proof as well as with the majority view of our sister jurisdictions.  *See Advent Sys. Ltd.*, 925 F.2d at 673; *Phil Crowley Steel Corp.*, 782 F.2d at 783; *American Med. Int'l*, 832 S.W.2d at 337; *Holloway*, 898 S.W.2d at 796.  *But see Bendix Corp.*, 610 P.2d at 29.

*WCS v. GSI*, 33 S.W.3d 779, 784 (Tenn. 2000).[3]

---

[3]The court observed in footnote:

> The decision in *Boulevard Associates* indicates that the privilege can be lost upon the showing of malice. 72 F.3d at 1037. In Connecticut, unlike the case in Tennessee, malice is not part of the element for procurement of breach of contract. It would not be appropriate in Tennessee to permit the privilege to be lost merely upon a showing of malice because malice is part of the general cause of action and must be shown in all cases. *Testerman v. Tragesser*, 789 S.W.2d 553, 556-57, (Tenn. Ct. App. 1989). If the parent corporation's privilege were lost upon a showing of malice, the privilege would be illusory.

(continued...)

The Supreme Court of Oregon, in *Welch v. Bancorp Management Services*, 675 P.2d 172 (Or. 1983), explained, in an articulate opinion, the reasons supporting the privilege:

> In *Wampler v. Palmerton, supra*, this court held that the managing officer and the business adviser of a corporation who, for the benefit of the corporation, induced the corporation to breach its contract with a third party, were not liable to the third party for interfering with the third party's contract with the corporation. The plaintiff in *Wampler* alleged that the defendants, by inducing the corporate breach of contract, intended to enrich the corporation and thereby indirectly to improve their own financial conditions.
>
> In *Wampler*, we said that a person who interferes with a contract is not always responsible for the resultant injury. When the person acts to promote '* * * an interest which is equal or superior in social value to that with which he interferes, his actions are said to be privileged or justified.' 250 Or. at 74, 439 P.2d 601.
>
> > 'In the usual interference with a contract situation, the person interfering is a complete stranger to the contractual relationship. A complicating ingredient is added where the party induced to breach its contract is a corporation and the third person who induces the breach is not a stranger, but is a person who, by reason of his position with the corporation, owes a duty of advice and action to the corporation.' * * *
> >
> > 'A corporation can only act upon the advice of officers or employe[e]s and through the actions of agents. Doing business through corporate structures is a recognized and necessary incident of business life. A party is usually able to abandon a disadvantageous but valid contract and be responsible for breach of contract only. Corporations would substantially be prevented from similarly abandoning disadvantageous but valid contracts, and from securing related business advice, if the officers and employe[e]s who advised and carried out the breach had to run the risk of personal responsibility in an action for interference with contract. Therefore, courts have tended to shield such persons from responsibility for inducing breach of the corporate contract, often saying that they are not liable if the action was taken in 'good faith' and for the benefit of the corporation.' 250 Or. at 74-75, 439 P.2d 601.
>
> Further, we said that when officers or employees of a corporation induce the corporation to breach its contract with a third party in order to serve interests other than those of the corporation, then the officers and employees are not immune from personal liability in an action for tortious interference with that contract. Thus, to

[3](...continued)
33 S.W.3d 779, 784 (Tenn. 2000).

enjoy immunity, a corporate officer or employee must be acting with the intent to benefit the corporation. 250 Or. at 76-77, 439 P.2d 601.

This court addressed the question whether lack of good faith exists where the selfish motivation of the corporate official or employee for inducing the corporate breach is to secure derivative benefits from the improved financial condition of the corporation. We noted that most corporate officers and employees have some personal interest in the financial welfare of their principal. Thus, if good faith were equated with lack of any selfish interest in enhancing the financial condition of a corporation, most officers or employees would not dare to give the business advice that it is their duty to render. Therefore, we held that good faith means no more than intent to benefit the corporation and is not equated with absence of a personal interest in the financial welfare of the corporation. *Wampler v. Palmerton, supra*, 250 Or. at 76, 439 P.2d 601.

*Welch v. Bancorp Management Services*, 675 P.2d 172, 176-77 (Or. 1983).

The advisor defendants in this case, acting within the scope of their employment, having led GSI into the California settlement agreement, were subsequently made aware by the Fister Memorandum of the disastrous consequences to GSI of performing the settlement agreement, reversed position, and counseled breach of the settlement agreement and, acceptance of the resultant liability in damages for breach of contract. No evidence has been offered establishing lack of good faith, improper motive, or use of wrongful means. The burden of proof to establish such rests on the plaintiffs. *WCS v. GSI*, 33 S.W.3d 779 (Tenn. 2000); *Forrester*, 869 S.W.2d 328 (Tenn. 1994).

The motion for summary judgment by the advisor defendants was properly granted by the trial court and will be affirmed.

## SUMMARY JUDGMENT FOR THE AFFILIATED DEFENDANTS

On page 70 of Appellants' excellent brief, it is asserted:

The Affiliated Defendants filed a motion to dismiss on the grounds that each was a direct or indirect general partner of Metric and hence could not as a matter of law be liable for inducing a breach of contract by Metric. R. at 104-105. After a hearing on Affiliated Defendants' motion to dismiss, the trial court elected to treat the motion to dismiss as one for summary judgment pursuant to T.R.C.P. 12.02(6) and granted the motion on the grounds that there were no genuine issues of material fact.

This ruling was erroneous since the trial court disregarded the requirement of T.R.C.P. 12.02 that if the trial court determines to treat a motion to dismiss as one for summary judgment, then 'all parties shall be given reasonable opportunity to present all material pertinent to such a motion by Rule 56.' T.R.C.P. 12.02. Plaintiffs had no reason to put on proof to establish a factual record of the separate

interests or motives of the Affiliated Defendants since the issue before the Court was purely a legal question. Had the Plaintiffs been given a reasonable opportunity to establish these facts, Plaintiffs could have done so. Since Plaintiffs were never given this opportunity, the trial court's grant of summary judgment in favor of Affiliated Defendants should be reversed.

The record does not support an assertion that Chancellor Ellen Hobbs Lyle, who converted this motion into a Rule 56 motion for summary judgment and granted it, acted to the surprise of the appellants. The Appellees' renewed motion to dismiss under T.R.C.P. Rule 12.02(6) was filed June 1, 1998, together with the affidavits of Robert A. Fiddaman, Joseph D. Long, Chris Komanowski, W. Patrick McDowell, Ronald Zuzack, Herman H. Howerton, and Mike C. Buckley.

On July 13, 1998, Appellants filed their response to this motion to dismiss, asserting, in part:

> However, the Defendants' purported Rule 12.02(6) motion must be treated as a motion for summary judgment because the motion relies upon matters outside the pleadings. Plaintiffs also respond with an Affidavit of Kenneth Nelson to demonstrate: (1) the Defendants have sufficient contacts in Tennessee for this Court to exercise personal jurisdiction over the Defendants as a matter of Tennessee law; (2) the legal claims against the remaining Defendants are valid under the law of California and Tennessee, whichever applies here; and (3) there are genuine issues of material fact that preclude summary judgment in this case.

This 36 page response by the appellants of July 13, 1998 is replete with factual assertions based in great part, on a 62 paragraph affidavit of Kenneth E. Nelson which was also filed on July 13, 1998.

Both the Rule 12.02(2) motion by the individual Defendants for dismissal for lack of personal jurisdiction, and the Rule 12.02(6) motion on behalf of the affiliated defendants to dismiss for failure to state a claim upon which relief could be granted, came on to be heard before Chancellor Lyle on August 14, 1998, and, on September 4, 1998, the Chancellor entered an order denying the Rule 12.02(2) motion of the advisor defendants and as to the Rule 12.02(6) motion as to the affiliated defendants held:

> Based upon the motions, pleadings, affidavits and arguments of counsel, the Court finds as follows:
> . . . .
> 2. The Court finds that the motion of Defendants Metric Realty, Metric Realty Corp., Metric Holdings, Inc., GIH Associates II, L.P., and Metric Realty Services, Inc. to dismiss for failure to state a claim has been converted into a motion for summary judgment pursuant to Tenn. R. Civ. P. 12.02(6) because the parties submitted matters outside the pleadings that were presented and non excluded by the Court. The Court further finds that no genuine issues of material fact exist relevant

to the claims asserted against these defendants, and that this motion should be GRANTED.

The Court notes that all of these defendants are direct or indirect general partners of Metric Partners Growth Suite Investors, L.P., the contracting party. Plaintiffs have not alleged or established that these defendants had motives or interests in the performance or non-performance of the settlement agreement any different from the motives or interests of the contracting party, Metric Partners Growth Suite Investors, L.P. No genuine issues of material fact exist, and these defendants are entitled to judgment in their favor, as a matter of law.

Thus, not only did the appellants fail to object to the treatment by Chancellor Lyle of the Rule 12.02(6) motion as a summary judgment motion under Rule 56, but on the first page of their response to the renewed motion informed her that she was compelled to treat it as a motion for summary judgment and proceeded to compound the necessity for converting it to a Rule 56 motion by filing the extensive affidavit of Kenneth Nelson.

Once converted to a Rule 56 motion for summary judgment, Appellants face the same problems with the affiliated defendants as they face with the advisor defendants. None of these Defendants owe any fiduciary duty to any of the appellants. They owe their loyalty to GSI and there is simply no evidence in the record that they acted either outside the scope of their agency or employment with GSI, acted in less than good faith, or applied wrongful means in counseling GSI to breach the contract with Plaintiffs and accept the consequences. They made a mistake in counseling GSI to accept the California settlement but because of insufficient information did not realize the adverse consequences for GSI of the settlement until they received the Fister Memorandum. Then they advised GSI to breach the contract for reasons best expressed by Robert A. Fiddaman in his deposition:

Q.      My question is, why didn't Metric go ahead and purchase the property under the settlement agreement and then if it had some dire consequences go after those people who had advised Metric to enter into the deal?
A.      That would be a pretty stupid business decision.
Q.      Why?
A.      Why would you - - litigation has started out over less than $200,000 that was going to be settled by, you know, this land purchase deal about which I don't remember the economics of at all. Why would you put at risk a 12 million dollar investment in a totally unrelated property to try to settle the matter and then try to recoup that by suing people? That makes no sense at all. I would never make that business decision.

There is no doubt it was embarrassing for the defendants but their duty was to GSI.

The motion for summary judgment for the affiliated defendants was correctly sustained by the Chancellor and will be affirmed.

Appellees appeal the denial by the trial court of their motion for summary judgment based upon the expiration of the statute of limitations. In overruling this motion we find the Chancellor to be in error.

The complaint in this case was filed on June 26, 1997. The applicable statute of limitations of the State of California is two years. *California Civil Code of Procedure* § 339. The cause of action accrues on the date of the alleged wrongful act and can not be later in the actual breach of the contract by the party who was wrongfully induced to breach it. *Trembath v. Digardi*, 43 Cal. App. 3d at 434.

The Tennessee statute of limitations is three years. T.C.A. § 28-3-105. The cause of action accrues when the injury occurs or is discovered or when, in the exercise of reasonable care and diligence, it should have been discovered. *McCroskey v. Bryant Air Conditioning Co.*, 524 S.W.2d 487 (Tenn. 1975).

The record in this case establishes that the breach of contract relative to the California settlement agreement occurred no later than August 27, 1993. In the breach of contract action filed by Nelson against GSI in the Chancery Court of Davidson County, Chancellor Kilcrease so held in his order of February 9, 1996: The discovery rule does not permit a plaintiff in Tennessee to wait until he knows all of the injurious effects or consequences of a tortious act. The statute is tolled only during the period when the plaintiff has no knowledge at all that a wrong has occurred and as a reasonable person is not put on inquiry. *Teeters v. Currey*, 518 S.W.2d 512 (Tenn. 1974); *Woods v. Sherwin-Williams Co.*, 666 S.W.2d 77 (Tenn. Ct. App. 1983). On January 31, 1994, Nashville Lodging Company, a Kenneth Nelson company, filed suit in Wisconsin against Metric Partners Growth Suite Investors, L.P. and one of the defendants in this case, Chris Komanowski, alleging, in part:

> 4. On March 23, 1993, a settlement agreement was reached by which it was agreed NLC would convey real estate located in Nashville, Tennessee for an agreed price and under agreed terms to GSI.
>      . . . .
> 8. Shortly after entering the settlement agreement, GSI refused to purchase the Nashville real estate because of alleged title problems with the Nashville real estate, most prominently the Nashville litigation to which GSI was a party and had knowledge of prior to entering into the settlement agreement.
>      . . . .
> 13. GSI's refusal to purchase the Nashville real estate, and to perform the other terms of the settlement agreement, constitute breaches of the settlement agreement.
> 14. As a result of GSI's breaches plaintiff has suffered damages including without limitation: (1) legal fees paid by NLC in dealing with the Nashville litigation; and (2)

the decrease in value of its land due to the risk associated with the Nashville litigation.

The record in this case discloses that Kenneth Nelson testified in the breach of contract case against GSI in the Chancery Court of Davidson County:

Q.     When do you believe that Metric had unequivocally repudiated the settlement?
A.     I believe that Metric had decided to repudiate not later than some time in April 1993.
Q.     But my question is not when you believe Metric made a decision, but when did you believe that Metric had communicated to you that it was repudiating the settlement?
A.     Not later than July 1993. That may have been earlier.

Thus, it is clear that Kenneth Nelson knew the contract had been breached by GSI as early as July 1993 and that he and Nashville Lodging Company had suffered damages from the breach no later than January 31, 1994, when the Wisconsin action was filed. The three year statute of limitations thus had expired on June 27, 1997, when the suit at bar was filed.

Appellants attempt to avoid the statute of limitations by asserting a continuing conspiracy among the defendants. There is, in this case, no conspiracy for reasons announced by the Supreme Court of Tennessee in *Trau-Med of America, Inc. v. Allstate Ins. Co.*, 2002 WL 451826 (Tenn. Mar. 25, 2002). Said the Supreme Court:

> Courts in other jurisdictions - - both federal and state - - that have addressed issues involving civil intracorporate conspiracy allegations have adopted the 'intracorporate conspiracy immunity doctrine' to hold that wholly intracorporate conduct does not satisfy the plurality requirement necessary to establish an actionable conspiracy claim. This single entity view of intracorporate conduct derives from traditional principles of agency law. A basic principle of agency is that a corporation can act only through the authorized acts of its corporate directors, officers, and other employees and agents. Thus, the acts of the corporation's agents are attributed to the corporation itself. 'The two are not one and another. So merged are their identities, when the agent is acting for the corporation (the only way it can act al all), that the one may not be an accessory of the other.' *Haverty Furniture Co. v. Foust*, 174 Tenn. 203, 212, 124 S.W.2d 694, 698 (1939) (citations omitted). Because the law requires two or more persons or entities to have a conspiracy, a civil conspiracy is not legally possible where a corporation and its alleged co-conspirators are not separate entities, but instead stand in a principal-agent relationship. *See* 16 Am.Jur.2d Conspiracy §56 (1998).
> We recognize the rule expressed by this doctrine as a sound one, and consequently, we hold that there can be no actionable claim of conspiracy where the

conspiratorial conduct alleged is essentially a single act by a single corporation acting through its officers, directors, employees, and other agents, *each acting within the scope of his or her employment*. The acts of these representatives, if performed within their representative, agency, or employment capacities on behalf of the corporation, are attributed to the corporation. *See* Forrester v. Stockstill, 869 S.W.2d 328, 334-35 (Tenn. 1994). As long as the agent is acting within the scope of his or her authority, the agent and the corporation are not separate entities and cannot be the sole parties to a conspiracy. *See, e.g.*, Day v. General Elec. Credit Corp., 15 Conn. App. 677, 546 A.2d 315, 318-19 (Conn. App. Ct. 1988). Indeed, it is this 'scope of employment' exception that prevents the intracorporate conspiracy immunity doctrine from being applied too broadly and thereby immunizing all private conspiracies from redress where the actors coincidentally were employees of the same company. *See* Johnson v. Hills & Dales Gen. Hosp., 40 F.3d 837, 840 (6th Cir. 1994). Therefore, for a claim of intracorporate conspiracy to be actionable, the complaint must allege that corporate officials, employees, or other agents acted outside the scope of their employment and engaged in conspiratorial conduct to further their own personal purposes and not those of the corporation. *See, e.g.*, Renner v. Wurdeman, 231 Neb. 8, 434 N.W.2d 536, 542 (Neb. 1989).

*Trau-Med America, Inc. v. Allstate Ins. Co.*, WL 451826, at *11 (Tenn. Mar. 25, 2002).

The limitation period provided by section 28-3-105 expired prior to the time this action was filed and the Chancellor erred in denying the motion for summary judgment. Appellants produced no evidence that the Defendants acted for personal purposes and not for corporate purposes.

## CONCLUSION

In this case, Appellants assert that the law of Tennessee governs everything. Appellees assert that the law of California is controlling. Both parties agree that the only significant difference in the law of Tennessee and the law of California is that the statute of limitations in California is two years and the statute of limitations in Tennessee is three years. The Chancellor held that there was no significant difference in the law in these two jurisdictions and we agree. We have applied the law of Tennessee and see no need to extend this opinion with an academic exercise as to which law should actually apply. The result under the law of either California or Tennessee would be the same.

The action of the trial court in granting summary judgment to the advisor defendants and Metric Management, Inc., whose only connection with the case was its status as employer of the individual defendants Long, Komanowski, and Zuzack, is affirmed. The action of the chancellor in converting the Rule 12.02(6) motion to dismiss filed by the affiliated defendants into a Rule 56 motion for summary judgment and then sustaining same is affirmed. The action of the Chancellor in overruling the motion of all the defendants for summary judgment because of expiration of the statute of limitations is reversed and summary judgment on such grounds is granted.

The case is affirmed in part, reversed in part, and remanded to the trial court for any further proceedings deemed necessary. Costs of the cause are assessed against Appellants for which execution may issue if necessary.

_____

WILLIAM B. CAIN, JUDGE